NATIONAL ASSOCIATION OF REGU-
LATORY UTILITY COMMISSION-
ERS, Petitioner,

v.

U.S. DEPARTMENT OF ENERGY and
United States of America,
Respondents.

ARKANSAS POWER & LIGHT
COMPANY, et al., Petitioners,

v.

DEPARTMENT OF ENERGY and
United States of America,
Respondents,

The National Association of Regulatory
Utility Commissioners, Intervenor.

Nos. 87–1483, 87–1566.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 13, 1988.
Decided June 28, 1988.

Jay E. Silberg, Washington, D.C., for petitioners Arkansas Power & Light Co., et al.

Charles D. Gray, with whom Paul Rodgers, Washington, D.C., was on the brief, for petitioner Nat. Ass'n of Regulatory Utility Com'rs.

Michael P. Healy, Atty., Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen., and John A. Bryson, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Paul Rodgers and Charles D. Gray, Washington, D.C., entered appearances for intervenor, Nat. Ass'n of Regulatory Utility Com'rs, in No. 87–1566.

Before WALD, Chief Judge, and BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

These cases arise out of a "Notice" published in the Federal Register by the Department of Energy. The Notice tentatively establishes a method for allocating the costs of developing, constructing, and operating nuclear waste repositories between the government and commercial producers of such waste. The National Association of Regulatory Utility Commissioners (NARUC) and Arkansas Power & Light Co. (AP & L), petitioners in these consolidated cases, challenge the Notice on both substantive and procedural grounds.

In addition, these parties appeal from the denial of their petitions for rulemaking, which urged the agency to use substantive rulemaking procedures to determine its allocation methodology and to develop payment schedules and establish interest charges for deferred payment of the government's waste disposal fees. For the reasons stated below, we find that the petitioners' challenge to the Department's "Notice" is not presently ripe for review and that the Department did not abuse its discretion in denying the petitions for rulemaking.

## I. BACKGROUND

Congress enacted the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* (1982), to establish a comprehensive program for the disposal of high-level radioactive waste and spent nuclear fuel (HLW/SNF) generated by civilian nuclear power reactors. The Act contemplates that such wastes will eventually be stored in permanent federal repositories "that will provide a reasonable assurance that the public and the environment will be adequately protected" from the hazards they pose. *See* 42 U.S.C. § 10131(b)(1). To ensure that the costs of designing, constructing, and operating such repositories are borne by those generating the waste, the Act provides for a Nuclear Waste Fund "composed of payments made by the generators and owners of such waste and spent fuel." *Id.* at § 10131(b)(4); *see id.* at § 10222.

Congress delegated primary responsibility for developing and administering the waste disposal program to the Department of Energy (DOE), and more particularly, to the Office of Civilian Radioactive Waste Management (OCRWM), which the Act established within the Department. *Id.* at § 10224. Section 302(a) of the Act, 42 U.S.C. § 10222(a)(1), authorizes the Secretary of DOE to enter into contracts with genera-

tors of HLW/SNF to provide for its transportation and disposal, and specifies that "[s]uch contracts shall provide for payment to the Secretary of fees ... sufficient to offset expenditures" connected with the waste disposal program. With respect to electricity generated after April 6, 1983, the Act provides that the fee payable to the agency for waste disposal "shall be equal to 1.0 mil per kilowatt-hour." *Id.* at § 10222(a)(2). For HLW/SNF from the generation of electricity before that date, the Act requires the Secretary to establish a one-time fee "in an amount equivalent to an average charge of 1.0 mil per kilowatt-hour" of electricity. *Id.* at § 10222(a)(3); *see General Electric Uranium Management Corp. v. Department of Energy,* 764 F.2d 896 (D.C.Cir.1985) (upholding DOE's rule for computing this one-time fee).

Pursuant to this statutory authorization, DOE has entered into a standard contract with all civilian entities that generate or hold title to HLW/SNF. *See* 10 C.F.R. § 961.11 (1988). The provisions of this contract address, among other things, schedules for the delivery of HLW/SNF to repositories, the timing of payments into the Nuclear Waste Fund, and interest on late payments. Under the terms of their individual contracts, civilian utilities paid more than $2.6 billion into the Nuclear Waste Fund from 1983 to the end of fiscal year 1986. *See* 52 Fed.Reg. 31508 (1987).

The Act requires the Secretary annually to evaluate "whether collection of the fee [specified in the statute] will provide sufficient revenues to offset the costs" of the waste disposal program. 42 U.S.C. § 10222(a)(4). In the event that the Secretary concludes that the fee is either insufficient or excessive relative to costs, he must submit a fee adjustment proposal to Congress. The Act provides that the Secretary's proposal will become effective 90 days after it is transmitted unless either House of Congress adopts a resolution disapproving the adjustment. *Id.* All parties to this litigation agree that the provision allowing for a one-House "legislative veto" of the Secretary's recommendation is invalid in light of the Supreme Court's decision in *Immigration and Naturalization Ser-*

*vice v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

Each year since 1983, the Secretary has published an annual "Fee Adequacy Report" concluding, not unlike Goldilocks, that the statutory fee is not too high, and not too low, but just right. Perhaps in tribute to that considered judgment, no generator of HLW/SNF has ever sought judicial review of that conclusion in any of the Secretary's annual Fee Adequacy Reports.

When it passed the Act, Congress did not decide whether high-level radioactive waste resulting from atomic energy defense activities (DHLW) should be stored in the repositories developed under the Act or, alternatively, in a separate facility for such wastes alone. *See* 42 U.S.C. § 10107(b)(1). Instead, it directed the President to evaluate the issue, taking account of "cost efficiency, health and safety, regulation, transportation, public acceptability, and national security." *Id.* Unless the President found, after such evaluation, that a separate repository for defense wastes was required, the Act instructed the Secretary to "proceed promptly with arrangement for the use of one or more of the [civilian] repositories" to be developed under the Act. *Id.* at § 10107(b)(2).

The relatively simple scheme, set out above, for financing the waste disposal program was complicated on April 30, 1985, when the President determined that there was no basis for establishing a separate repository for DHLW, and directed the Secretary of DOE to arrange for the disposal of such government wastes in the repositories being developed for civilian HLW/SNF. As a result of this Presidential directive, the Secretary was obliged, under § 8 of the Act, to "proceed promptly with arrangement for the use of one or more of the [civilian] repositories" for the disposal of DHLW. *Id.* The Act specifically provides that "[s]uch arrangements shall include the allocation of costs of developing, constructing, and operating this repository or repositories. The costs resulting from permanent disposal of [DHLW] shall be paid by the Federal

Government, into the [Nuclear Waste Fund]." *Id.*

In the wake of the President's decision to use the civilian repositories for defense wastes, the electric utility industry has urged DOE to establish a methodology for allocating the program costs between civilian and defense users. On December 2, 1986, DOE responded by publishing a "Notice of Inquiry" setting forth its preferred method (and two alternative methods) for allocating disposal costs. 51 Fed.Reg. 43566. The Notice of Inquiry invited comments from interested parties; among the many who accepted this invitation were petitioner NARUC, and two industry associations, the Edison Electric Institute (EEI) and the Utility Nuclear Waste Management Group (UNWMG), of which petitioner AP & L is a member.

Insofar as pertinent to this case, these commenters (1) called for DOE to institute substantive rulemaking on the cost allocation methodology; (2) criticized the Department for failing to address fee payment mechanisms, interest charges, and delivery schedules for DHLW; and (3) set forth an alternative cost allocation methodology that was, in the commenters' view, more "equitable" than DOE's preferred approach. They also filed separate petitions for rulemaking, which urged DOE to establish, through substantive rulemaking, both a cost allocation methodology and procedures governing such other matters as "the timing of payments, interest charges, acceptance rates and delivery schedules," not addressed in the Notice of Inquiry. The Department denied these rulemaking petitions in letters dated August 14, 1987.

Six days later, on August 20, 1987, DOE published a Notice presenting "the Department's method for calculating the appropriate allocation of costs for the disposal of [DHLW]." 52 Fed.Reg. 31508. While this Notice set forth a general method for allocating costs, it did not include any schedule for payment of fees by the government. The agency reasoned that "[f]unding of the costs of disposal of DHLW by payment into the [Nuclear Waste Fund] must be addressed by Congress during the normal budgetary and appropriation process." *Id.* at 31510. The method adopted in the Notice would, however, be incorporated into a "DHLW disposal agreement" being negotiated between OCRWM and DOE's Office of Defense Programs (ODP). This intra-agency "Memorandum of Agreement" "will provide the basis for the amount of funds to be requested in the future [ODP] budget requests, as well as other details related to the DHLW fee." *Id.* at 31510. Thus, the cost allocation method adopted in the Notice would eventually be used to "formulate future requests for appropriations for funds to pay into the Nuclear Waste Fund to cover the costs of disposal of [DHLW]." *Id.* at 31508. In addition, the Department also noted that this methodology would be used to determine the share of total disposal costs allocable to DHLW, and hence the amount left to be raised from civilian generators, in the Secretary's annual Fee Adequacy Reports. *Id.* at 31509, 31514.

In the simplest possible terms, the allocation methodology adopted in the Notice is as follows. All costs incurred under the program must be assigned to one of three categories: (1) direct costs; (2) common variable costs; and (3) common unassigned costs. Direct costs, not surprisingly, are costs such as transportation that are "incurred solely for the disposal of either DHLW or civilian wastes"; they are to be allocated between the two accordingly. *Id.* at 31512. Common variable costs are costs that may be "allocated to both DHLW and civilian waste generators on the basis of cost sharing factors developed from the relevant physical parameters." *Id.* For example, the cost of underground service systems will be allocated between civilian and defense users on the basis of "areal dispersion," i.e., "the ratio of the repository disposal area required for DHLW disposal to the total disposal area." *Id.* at 31512–13. Finally, common unassigned costs are any remaining costs, such as government administration, "which cannot be directly allocated or cannot be allocated based on cost sharing factors developed from relevant physical parameters." *Id.* at 31512. These costs are to be "allocated to both

defense and civilian waste generators in proportion to their respective shares of the appropriate assignable [i.e., direct and common variable] cost categories." *Id.* at 31512–13.

The petitioners in these consolidated cases seek review of both the August 14, 1987 letter denying their petitions for rulemaking and the August 20, 1987 Notice. They raise the following issues for our consideration: (1) whether various elements of the cost allocation methodology adopted by the Department result in an inequitable allocation of costs between the government and the civilian utilities; (2) whether the agency erred by promulgating its cost allocation methodology through a non-binding "Notice," rather than through substantive rulemaking under the Administrative Procedure Act (APA); and (3) whether the agency improperly denied their petitions for rulemaking. We find that the first two claims are not now ripe for review. As for the third claim, we affirm the Department's decision to deny the petitions for rulemaking.

## II. RIPENESS

■ The petitions for review fault the Department's chosen methodology on a number of substantive grounds, including (1) the decision to allocate common unassigned costs in the same proportion as direct costs and common variable costs; (2) the failure to include any provisions regarding the timing of DHLW payments and interest charges allocable to the government; and (3) the assignment of particular costs to individual cost categories. In response, the Department contends that these objections to its allocation methodology are not ripe for review.

In analyzing the government's position, we start with the Supreme Court's opinion in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which identified the following purposes served by the ripeness doctrine:

> [the] basic rationale [of the doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148, 87 S.Ct. at 1515. These principles gave rise to a two-part test that "requir[es] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1516. Under this test, "if the interests of the court and agency in postponing review outweigh the interests of those seeking relief, settled principles of ripeness squarely call for adjudication to be postponed." *State Farm Mutual Auto. Ins. Co. v. Dole*, 802 F.2d 474, 480 (D.C.Cir.1986).

We consider first this court's interest in delaying review in order to avoid "entangling [our]selves in abstract disagreements over administrative policies." As Judge, now Justice, Scalia has noted, this policy benefits the courts in two respects:

> First, protecting us from adjudicating matters that are not sufficiently "fleshed out" that we may see the concrete effects and implications of what we do. And second, protecting us from adjudicating matters that in fact make no difference and are a waste of our resources.

*American Trucking Ass'ns, Inc. v. ICC*, 747 F.2d 787, 789–90 (D.C.Cir.1984).

The petition for review before us poses both these dangers. As of now, DOE has not applied its cost allocation method in a way that would allow us to consider, by examining its "concrete effects and implications," whether it is consistent with the Act. As we noted in *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 674 (D.C.Cir. 1978), "judicial review is generally facilitated by waiting until administrative policy is implemented for then a court can be freed, at least in part, from theorizing about how a rule will be applied and what its effect will be." Petitioners suggest, however, that judicial interests favor review because the issues they raise are "purely legal."

Assuming *arguendo* that this characterization of petitioners' substantive claims is correct, the court may still conclude that its "deliberations might benefit from letting the question arise 'in some more concrete and final form.'" *State Farm,* 802 F.2d at 479 (quoting *Eagle–Picher Industries v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985)).

Second, it is not yet clear whether the methodology "make[s] [a] difference," to the petitioners before us, nor, if so, how. As the government points out, DOE has not yet used the methodology "in any way to modify the obligations of civilian utilities under the standard contracts." They continue to be liable, under the terms of their contracts with DOE, to pay a fee equal to one mil per kilowatt hour. Petitioners urge, however, that DOE's methodology "will directly affect electric utility rates" because it will be used to calculate the adequacy of the civilian fee in the 1988 Fee Adequacy Report. According to petitioners, substantive errors in the methodology may lead the agency to increase the 1 mil/kilowatt hour fee during the next fee assessment; even if the agency leaves the current fee unchanged, the petitioners may again be denied a decrease in fees to which they would have been entitled had the allocation method not been flawed.

While DOE concedes that the methodology will be applied in the 1988 fee assessment, it does not concede that this application will necessarily affect the amount the petitioners are required to pay, arguing that: "most repository program costs are, at best, estimates necessarily dependent on uncertain predictions of inflation, interest rates, system design, and waste amounts." The government's point seems to be that, because of such uncertainties, it is not clear whether it would lower the fee paid by the utilities even if it accepted the changes they seek. While this argument remains a bit murky—it would seem that if a revised methodology yielded a lower fee based solely on cost allocation, that would not be an occasion warranting an offsetting change in the predicted rate of inflation, for example—we think it is clear enough that some or all of the claims raised today may well prove to be no more than theoretical when petitioners revisit them in the context of a concrete application; moreover, the opportunity to do so in the 1988 Report, should they be aggrieved by it, is imminent. The interests of the court therefore favor postponing review until it is clear that judicial intervention is required, and will be consequential.

That the Notice has no apparent impact on the level of current civilian fees also leads us to conclude that the second factor identified in *Abbott Laboratories,* i.e., hardship to the parties, does not militate in favor of immediate review. As this court recently noted, "for an institutional interest in deferral to be outweighed, postponing review must impose a hardship on the complaining party that is immediate, direct, and significant." *State Farm,* 802 F.2d at 479–80. As the foregoing discussion illustrates, petitioners can demonstrate no such hardship. Any injury they allege is a hypothetical future injury owing to the Department's expected use of the methodology in its 1988 Report, not a present hardship resulting from the Notice itself. *Compare American Trucking Ass'ns,* 747 F.2d at 790 ("At most the policy statement means that *future* actions of the Commission … may be damaging to the petitioners—but that prospect in no way affects any action they must take or should take at the present time."); *State Farm,* 802 F.2d at 480 ("'The mere *potential* for future injury' … is not enough.") (Emphasis in original, citation omitted). Petitioners' challenge therefore threatens to draw this court "away from the domain of judicial review into a realm more accurately described as judicial preview." *Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 751 (D.C.Cir.1984).

With this court's interest in postponing review on one side of the *Abbott Laboratories* balance, and no countervailing hardship to the petitioners on the other side, the Department's assertion that its own interests further tip the balance in favor of delay is of no moment. *See American Trucking Ass'n,* 747 F.2d at 789–90. We therefore conclude, without further ado,

that review of these claims at this juncture would be premature.

■ Petitioners have also raised a procedural challenge to the Notice, however. They assert that the Department should have used APA procedures for substantive rulemaking to formulate and adopt its cost allocation methodology; had it done so, its decision would be formalized in regulations it was bound to follow until they were changed, which would protect the utilities from arbitrary policy changes in the future.

We conclude that this procedural challenge should also be postponed, based, in part, on the same *Abbott Laboratories* test we applied above. The question whether notice and comment rulemaking was required turns, to a large degree, on whether the cost allocation methodology has a "present, binding effect" on the utilities. *Community Nutrition Inst. v. Young,* 818 F.2d 943, 947 (D.C.Cir.1987). As we noted above, however, the effect of the cost allocation methodology on the utilities is currently open to doubt and may well be clarified when the next Fee Adequacy Report issues. Thus, the court has a genuine interest in postponing review of petitioners' procedural claim, too. And once again, the petitioners face no hardship from delay. In addition, judicial economy favors considering all challenges to the Department's methodology, both substantive and procedural, in one proceeding. Accordingly, we find that the petitioners' procedural claim is not now ripe for separate review.

III. THE PETITIONS FOR RULEMAKING

■ Finally, we consider the petitioners' contention that the Department erred in denying its request to proceed by rulemaking in formulating both the cost allocation methodology and the intra-agency Memorandum of Agreement currently being negotiated between OCWRM and ODP. In *American Horse Protection Ass'n v. Lyng,* 812 F.2d 1 (D.C.Cir.1987), we recently determined that the Supreme Court's holding in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), that agency decisions not to initiate enforcement actions are presumptively unreviewable, did not preclude limited review of an agency's refusal to initiate rulemaking. Nonetheless, we stressed the narrow standard of review of such decisions; referring to the level of deference we owe to the agency's decision we said:

> [A]n Agency's refusal to institute rulemaking proceedings is at the high end of the range. Such a refusal is to be overturned "only in the rarest and most compelling of circumstances," which have primarily involved "plain errors of law, suggesting that the agency has been blind to the source of its delegated power."

812 F.2d at 4–5 (citations omitted); *see also Arkansas Power & Light Co. v. ICC,* 725 F.2d 716, 723 (D.C.Cir.1984). Our role in reviewing the denial of such a petition, therefore, "is limited to ensuring that the agency has adequately explained the facts and policy concerns it relied on, and that the facts have some basis in the record." *Arkansas Power & Light Co.,* 725 F.2d at 723.

DOE stated its reasons for denying the petitions in the August 14, 1987 letters. It began by noting that while the Nuclear Waste Policy Act required it to make arrangements for the disposal of DHLW, the Act did not require that such arrangements be made by "substantive rulemaking." The Department also pointed out that it had solicited public comments on the cost allocation methodology in its Notice of Inquiry and was even then in the process of responding to the comments it had received and preparing the cost allocation methodology for publication in the Federal Register. The Department was of the view that this procedure "substantially satisfies the needs of interested members of the public for notice and an opportunity to be heard." More cumbersome and time-consuming rulemaking proceedings were not required, it said, because "the Department is not engaged in any activity which has a direct binding, regulatory impact on the public."

This was a "reasoned" explanation of the Department's decision to decline the peti-

tions for rulemaking. *See American Horse Protection Ass'n*, 812 F.2d at 5. As the Department noted, the Secretary had already begun a proceeding to allocate the costs of the waste repositories at the time the petitions for rulemaking were filed. While the Secretary explicitly solicited (and presumably considered) public comment, he concluded that substantive rulemaking procedures were unnecessary because (1) they were not required under the Act, and (2) the cost allocation methodology would not have "a direct binding, regulatory impact on the public." As for the first rationale, we agree with petitioners that the lack of any explicit rulemaking requirement in the Act cannot alone justify the denial of the petitions in light of the APA's general call for rulemaking on substantive matters. *See* 5 U.S.C. § 553. Nonetheless, we read the Department's finding that its actions would not have a "direct binding, regulatory impact on the public" as a determination that the cost allocation methodology was an interpretative, rather than a legislative rule, and was therefore exempt from the rulemaking requirements of the APA. 5 U.S.C. § 553(b)(A); *see Community Nutrition Inst.*, 818 F.2d at 946 (distinguishing between legislative and interpretative rules or statements of policy); *Batterton v. Marshall*, 648 F.2d 694, 699–707 (D.C.Cir. 1980) (same); *American Bus Ass'n v. United States*, 627 F.2d 525, 527–33 (D.C. Cir.1980) (same).

Petitioners vigorously dispute this conclusion, and urge us to decide whether the cost allocation methodology is indeed a legislative (or merely an interpretative) rule. This request misconstrues the nature of our inquiry, limited as it solely to determining whether the agency's decision was "reasoned." Under this very narrow standard of review, we need not find that the decision was in all respects correct in order to uphold it, but only that it was not in any respect irrational or demonstrably incorrect. The Department's conclusion that the Notice was not a legislative rule meets this standard. The distinction between legislative and interpretative rules or policy statements is rarely easy to apply. To the contrary, "[it] has been described at vari-

ous times as 'tenuous,' 'fuzzy,' 'blurred,' and, perhaps most picturesquely, 'enshrouded in considerable smog.'" *Community Nutrition Inst.*, 818 F.2d at 946 (citations omitted). Here, the characterization of the Department's action depends, to a considerable degree, on whether it has a "present, binding effect" on the utilities. *Id.* at 947. But, as we have repeatedly noted, the present effect of the cost allocation methodology on the utilities is anything but clearly visible. Therefore, while we need not determine that it was correct, we can hardly conclude that the Department's characterization of its own rule as "interpretative" was unreasoned.

Finally, the petitions for rulemaking also requested that the Department promulgate the Memorandum of Agreement between OCRWM and ODP through rulemaking. This Memorandum is currently under negotiation and its contents are, as yet, unknown. DOE has said it will publish the Memorandum in the Federal Register when it is completed, but has declined to promulgate it by rulemaking on the ground that "[l]ike interagency agreements, agreements between offices of the same agency are ordinarily concluded without soliciting public comment or substantive rulemaking under [the APA]." 52 Fed.Reg. 31509.

Only by speculating about the topics that may be covered in the agreement are petitioners able to argue that it will constitute a substantive rule subject to the rulemaking requirements of the APA. This attack on the Memorandum is wholly premature; at this stage, the Memorandum is not fundamentally different from an internal agency draft of a rulemaking proposal. Nothing in the APA gives the public the right to participate in the intra-agency process at this preliminary stage. Of course, if the ultimate contents of the Memorandum are such that they must by law be adopted by regulations, the parties may renew their petition in good time.

IV. CONCLUSION

Our decision today is a narrow one: we hold only that the substantive and procedural validity of the Department's cost allo-

cation methodology are questions better considered when that methodology has been applied in the context of the Secretary's annual assessment of the adequacy of the fees utilities pay. In particular, we stress that our decision in Part III of our opinion not to compel the Department to engage in substantive rulemaking should not be read to preclude the petitioners from renewing, in a later proceeding, their claim that the Department's cost allocation methodology is a legislative rule subject to the requirements of the APA. Accordingly, the instant petitions for review are

*Denied.*