**CHAMBER OF COMMERCE OF the UNITED STATES of America, et al., Plaintiffs,**

v.

**Robert B. REICH, Secretary, U.S. Department of Labor, Defendant.**

**Civ. A. No. 95–0503.**

United States District Court, District of Columbia.

May 9, 1995.

Timothy B. Dyk, Andrew M. Kramer, Willis J. Goldsmith, Stephen J. Goodman and Stephen F. Smith, Jones, Day, Reavis & Pogue, Washington, DC, for plaintiffs.

Thomas S. Williamson, Jr., Office of Sol., Dept. of Labor, Margaret Hewing, Sandra Marguerite Schraibman, Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM–OPINION

KESSLER, District Judge.

### I. Introduction and Procedural History

This is a suit brought by the Chamber of Commerce, Bridgestone/Firestone, and several corporate trade associations against the Secretary of Labor for declaratory relief and an injunction prohibiting the Secretary from enforcing or administering an Executive Order. Although the suit was filed against the Secretary of Labor, it is, in essence, a suit against the President for promulgating the Executive Order in question. Because the Court ultimately concludes that the case is not ripe for review and consequently must be dismissed, it will not address either the merits of Plaintiffs' case or the reviewability of Defendant's actions in implementing the Executive Order.

On March 15, 1995, Plaintiffs, Chamber of Commerce of the United States of America, American Trucking Associations, Inc., Labor Policy Association, National Association of Manufacturers and Bridgestone/Firestone, Inc. filed the instant Complaint, as well as a Motion for Preliminary Injunction (3–1), seeking to immediately stop the implementation of Executive Order No. 12954 (*hereinafter*, "Executive Order" or "Order") and to declare it unlawful. Plaintiffs allege that the President lacked authority under both the Constitution and any Act of Congress to issue the Executive Order, which authorizes the Defendant, Secretary of Labor Robert B. Reich, to disqualify from federal contracts exceeding $100,000 employers who hire permanent replacement workers during a lawful strike.

On March 16, 1995, upon the request of Plaintiffs to expedite the motions hearing, and after conferring with counsel, the Court ordered consolidation of the hearing on the application for preliminary injunction with the hearing on the merits of this case. On March 24, 1995, and March 29, 1995, respectively, the National Right to Work Committee filed a Motion to File Amicus Brief, and Mosler, Inc. filed a Motion to Intervene as a Plaintiff, both of which the Court granted on April 12, 1995.

On April 3, 1995, Defendant filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment (13–1, 14–1), and Plaintiffs and Intervenor–Plaintiffs filed a Motion for Summary Judgment on April 7, 1995. Upon consideration of all motions papers, the arguments of counsel at oral argument April 20, 1995, the applicable case, constitutional, and statutory law, and the file in this case in its entirety, the Court concludes that Plaintiffs' Motions for Preliminary Injunction (3–1) and for Summary Judgment must be denied, and Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment must be granted (13–1, 14–1), for the reasons discussed below.

### II. Statement of Facts[1]

On March 8, 1995, President William J. Clinton issued Executive Order 12954. 60 Fed.Reg. 13023 (March 10, 1995). The Order's stated purpose was "to ensure the economical and efficient administration and completion of Federal Government contracts". *Id.* at 13023. The Order states that "[i]t is the policy of the executive branch in procuring goods and services that ... contracting agencies shall not contract with employers

---

[1] Both Plaintiffs and Defendants filed Statements of Material Fact pursuant to Local Rule 108(h). The Court treats all facts that were not disputed as conceded. *Id.*

The Court is entitled to consider affidavits, depositions, exhibits, court judgments and orders, letters, transcripts of prior court proceedings, matters of public record and other materials outside the pleadings in considering a motion under Federal Rule of Civil Procedure 12(b). *See* 5A C. Wright & A. Miller, *Federal Practice and Procedure,* (2d Ed.1990 and 1994 supp.) § 1364, at 475–481, and nn. 25–44.

that permanently replace lawfully striking employees." *Id.* The Order applies to government contracts in excess of $100,000. *Id.* at 13024–25 (§ 11, stating that this Order shall apply only to contracts in excess of the Simplified Acquisition Threshold, which is currently set at $100,000).

The Executive Order explains that "[e]fficient economic performance and productivity are directly related to the existence of cooperative working relationships between employers and employees", and that "[w]hen Federal contractors become involved in prolonged labor disputes with their employees, the Federal Government's economy, efficiency, and cost of operations are adversely affected." *Id.* at 13023. The Executive Order continues that, "[i]n order to operate as effectively as possible, by receiving timely goods and quality services, the Federal Government must assist the entities with which it has contractual relations to develop stable relationships with their employees." *Id.*

The Executive Order offers three justifications for its policy against contracting with firms that hire permanent replacement workers. First, "strikes involving permanent replacement workers are longer in duration than other strikes." *Id.* Second, "the use of permanent replacements can change a limited dispute into a broader, more contentious struggle, thereby exacerbating the problems that initially led to the strike." *Id.* Third, "[b]y permanently replacing its workers, an employer loses the accumulated knowledge, experience, skill, and expertise of its incumbent employees." *Id.* These consequences of hiring permanent replacement workers, according to the Executive Order, then "adversely affect the businesses and entities, such as the Federal Government, which rely on that employer to provide high quality and reliable goods or services." *Id.*

The Executive Order gives responsibility for the administration and enforcement of the Executive Order to the Secretary of Labor. *Id.* at 13024 (§ 6). As a first step, the Secretary may investigate and hold hearings to determine whether an organizational unit of a federal contractor has permanently replaced lawfully striking workers. *Id.* at 13023 (§ 2). The Secretary may initiate such investigations directly or in response to employee complaints. *Id.*

If the Secretary determines that a federal contractor has permanently replaced lawfully striking employees, he has two options: he may terminate the contract and/or debar the contractor. *Id.* at 13023–24 (§§ 3–4). First, the Secretary may find that it is appropriate to terminate the contract for convenience. *Id.* at 13023 (§ 3(a)). In that case, he must transmit his finding to the head of any department or agency that contracts with the contractor. *Id.* If the head of the contracting department or agency objects in writing, the termination for convenience shall not be issued. *Id.* at 13024 (§ 3(b)).

Second, if the Secretary determines that a federal contractor has permanently replaced lawfully striking employees, he has discretion to debar the contractor, thereby making the contractor ineligible to receive future government contracts. *Id.* (§ 4(a)). Departments and agencies may solicit offers from, award contracts to, or consent to subcontracts with debarred contractors only if the head of the agency or his or her designee determines, in writing, that there is a compelling reason to do so. The debarment will be limited to the organizational units of the debarred contractor that have permanently replaced workers, and will not extend beyond the date when the Secretary determines that the labor dispute precipitating the permanent replacement has been resolved. *Id.* (§§ 4(b)–4(c)).

The Secretary may adopt rules and regulations to implement the Executive Order. *Id.* (§§ 6, 11). On March 29, 1995, the Secretary published a Notice of Proposed Rulemaking. 60 Fed.Reg. 16354. The proposed regulations define and clarify terms used in both the Executive Order and the implementing rules themselves. *Id.* at 16354–55. Additionally, the proposed rules set forth the procedure to be followed in investigating contractors and taking action to enforce the Executive Order. *Id.* at 16355–56. Interested persons were given until April 28, 1995 to comment on the proposed rules. *Id.* at 16354.

Although no formal enforcement actions have commenced, and the implementing reg-

ulations have not been finalized, the Department of Labor has begun to seek information regarding certain government contractors that may have hired permanent replacement workers.

### III. Defendant's Motion To Dismiss Must Be Granted Because This Case Is Not Ripe For Review

#### A. The Abbott Laboratories Ripeness Standard

■ The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *see also Eagle–Picher Industries, Inc. v. United States Environmental Protection Agency*, 759 F.2d 905, 912–13 (D.C.Cir. 1985); *American Trucking Associations, Inc. v. Interstate Commerce Commission*, 747 F.2d 787, 789 (D.C.Cir.1984).[2]

■ In determining whether a case is ripe for review, the Supreme Court has set out a twofold analysis, requiring courts to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories, supra*, 387 U.S. at 149, 87 S.Ct. at 1515. This test is forward-looking, serving the primary function of "aiding a court in ascertaining whether it should stay its hand until agency policy has crystallized." *Eagle–Pitcher, supra*, 759 F.2d at 913.

■ The first, or "fitness requirement", of the *Abbott Laboratories* test focuses on the institutional interests of the agency and the courts in deferring review, while the second, or "hardship requirement", looks at the impact of the administrative action being challenged on the party challenging the action. *Abbott Laboratories, supra*, 387 U.S. at 148–49, 87 S.Ct. at 1515. The two parts of this test are interrelated and must be balanced. If "the interests of the court and agency in postponing review until the question arises in some more concrete and final form outweigh the interests of those seeking relief from the challenged action's 'immediate and practical impact' upon them," then "settled principles of ripeness squarely call for adjudication to be postponed." *Mountain States Telephone and Telegraph Co. v. FCC*, 939 F.2d 1021, 1029 (D.C.Cir.1991) (quoting *Continental Air Lines v. CAB*, 522 F.2d 107, 125 (D.C.Cir. 1975) (en banc)); *National Association of Regulatory Utility Commissioners v. U.S. Department of Energy*, 851 F.2d 1424, 1428 (D.C.Cir.1988); *State Farm, supra*, 802 F.2d at 480.

In this case, because the judicial and administrative interests served by deferral greatly outweigh any hardship that Plaintiffs might potentially suffer from such deferral, an examination of both prongs of the *Abbott Laboratories* test compels the conclusion that the Court must postpone adjudication.

#### B. The Fitness Requirement

■ In assessing the fitness of a case for judicial review, the court considers the institutional interests of both the court and the agency. *State Farm, supra*, 802 F.2d at 479. In so doing, several factors become relevant, including "whether agency policy has crystallized, whether the issue is 'purely legal,' and whether the agency or the court will benefit

---

2. The ripeness doctrine limits the power of federal courts in adjudicating disputes. *State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986). Its roots lie in both the Article III requirement of "case or controversy" and prudential considerations favoring the orderly conduct of the judicial and administrative processes. *Id.*

The ripeness doctrine "overlaps at its borders with Article III requirements of case or controversy." *Eagle–Picher, supra*, 759 F.2d at 915 and

n. 52. Further, "[t]he line dividing the prudential requirement of ripeness from the constitutional requirement of standing is 'difficult to discern and unnecessary to identify'". *Consolidation Coal Co. v. Federal Mine Safety and Health Review Commission*, 824 F.2d 1071, 1089 n. 4 (D.C.Cir.1987) (quoting *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 n. 12 (D.C.Cir.1986)). For purposes of clarity and simplicity, the Court will evaluate Plaintiffs' claim under a framework of ripeness alone.

from postponing review until the 'question arises in more concrete and final form.' " *Mountain States, supra,* 939 F.2d at 1028 (internal citations omitted). A further objective is to avoid "piecemeal, duplicative, tactical and unnecessary appeals which are costly to the parties and consume limited judicial resources." *Mount Wilson FM Broadcasters v. FCC,* 884 F.2d 1462, 1466 (D.C.Cir. 1990) (citing *Cobbledick v. United States,* 309 U.S. 323, 325–26, 60 S.Ct. 540, 541–42, 84 L.Ed. 783 (1940)). These factors are all interrelated; for example, "if the [agency's] position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision." *Id.* (internal quotation omitted).

■ The fitness prong protects the courts in at least two important respects, as Justice Scalia, writing as a Judge for the Court of Appeals for the D.C. Circuit, has emphasized: "First, [the doctrine] protect[s] [the courts] from adjudicating matters that are not sufficiently 'fleshed out' that we may see the concrete effects and implications of what we do", and, second, it protects the courts "from adjudicating matters that in fact make no difference and are a waste of our resources." *American Trucking, supra,* 747 F.2d at 789–90. The case at bar poses both of these dangers.

Because the regulations which will create the framework[3] for the implementation of the Executive Order have not yet been adopted, it is not possible for the Court to "see the concrete effects and implications" of the Executive Order. *National Association of Regulatory Utility Commissioners, supra,* 851 F.2d at 1428. For example, although Plaintiffs argue that the Executive Order conflicts with settled principles of federal labor law, the Court is not in a position to evaluate that argument until the mandates and effects of the Executive Order have been "crystallized" and "fleshed out". Otherwise, the Court undertakes the risk of passing judgment on the legality of one set of agency regulations—the ones currently proposed—

when it may be forced to re-examine the legality of the actual regulations that are ultimately adopted by the agency. This would constitute precisely the kind of judicial inquiry that our Circuit Court referred to as "mak[ing] no difference and ... wast[ing] our resources." *American Trucking, supra,* 747 F.2d at 789–90.

Additionally, the Executive Order explicitly affords the Secretary sufficient discretion in enforcement that it is impossible at this time to know with certainty that it will in fact be invoked against any of the Plaintiffs. For example, the Order states that if the Secretary determines that a contractor has permanently replaced lawfully striking workers, the Secretary "may" find that it is appropriate to terminate and/or debar the contractor. 60 Fed.Reg. at 13023 (§ 3(a)); 13024 (§ 4(a)).

The Order also provides that, in order to determine whether an organizational unit of a federal contractor has permanently replaced lawfully striking workers, the Secretary "may", by his own initiation or in response to employee complaints, investigate and hold hearings. *Id.* at 13023 (§ 2). Only then, if the Secretary determines that a federal contractor has permanently replaced lawfully striking employees, does the Secretary have discretion to terminate the contract and/or debar the contractor. *Id.* at 13023–24 (§§ 3–4).

Further, the head of the contracting department or agency has the authority to object to—and thereby veto—the termination of the contract. *Id.* at 13024 (§ 3(b)). Additionally, contracting department or agency heads may still solicit offers from, award contracts to, or consent to subcontracts with debarred contractors if they determine that there is a compelling reason to do so. *Id.* (§§ 4(b)–4(c)).

The proposed rules governing the implementation and enforcement of the Executive Order offer further support for the conclusion that the decision to terminate a contract or to debar a contractor is discretionary and therefore must be judged on a case-by-case basis.

---

**3.** The proposed rules and regulations flesh out and clarify both the substantive and procedural aspects of the Executive Order. 60 Fed.Reg. 16354–56.

For example, the proposed regulations provide that if the Deputy Assistant Secretary decides to conduct an investigation into the labor practices of a contractor, s/he shall transmit the record, including a proposed finding of fact and a recommendation as to debarment and/or termination of a contract or contracts, to the Assistant Secretary. 60 Fed.Reg. 16355 (§ 270.11) (March 29, 1995). The proposed regulations then direct the Assistant Secretary, upon receipt of the record, to make findings as to whether the organizational unit of the federal contractor has permanently replaced lawfully striking employees. *Id.* (§ 270.12(a)). If the Assistant Secretary finds that the organizational unit of the federal contractor has in fact permanently replaced lawfully striking employees, the Assistant Secretary must then decide *whether* it is "appropriate to propose debarment." *Id.* (§ 270.12(b)). If the Assistant Secretary finds that the unit has permanently replaced lawfully striking employees after the effective date of the Executive Order—March 8, 1995—she or he then must also determine "*whether* it is appropriate to propose termination for convenience of the contract or contracts of the organizational unit." *Id.* at 16355–56 (§ 270.12(c)) (emphasis added).

If the Assistant Secretary proposes debarment and/or termination, the organizational unit of the federal contractor has 15 days after receipt of notice of the proposed debarment or termination to oppose the proposed action, by submitting information and argument in person, in writing, or through a representative. *Id.* at 16356 (§ 2770.12(d)). If the Assistant Secretary finds that the submission by the organizational unit of the federal contractor in opposition to the proposed debarment and/or termination raises a genuine dispute over facts material to the proposed termination, the organizational unit has an opportunity to appear at an informal hearing presided over by the Assistant Secretary and her or his designee. *Id.* (§ 270.13(a)). The Assistant Secretary then makes a decision on the proposed debarment and/or termination based on the record. *Id.* (§ 270.13(b)).

As just described, this proposed regulatory context creates a complex system of fact-finding and decision-making, with numerous factual variables, multiple layers of decision-making, and unknown outcomes—which simply cannot be evaluated outside of a concrete factual setting. *See, e.g., City of Houston v. HUD*, 24 F.3d 1421, 1431 (D.C.Cir.1994) ("The challenged proscription is discretionary so that it is unclear if, when or how the agency will employ it." (internal quotation omitted)). Plaintiffs' contentions that the challenged policy "has already 'crystalliz[ed]' in fixed and definite form and is not subject to revision by the Secretary" and that the Executive Order "represents [the Executive Branch's] final word on the subject" are simply wrong. Accordingly, it cannot be said, as Plaintiffs contend, that "there is little to be gained through consideration of particularized facts." *Edison Electric Ins. v. United States EPA*, 996 F.2d 326, 334 (D.C.Cir. 1993). Plaintiffs are in essence asking the Court to conclude that this entire procedure, as cumbersome as it may be, is a sham with all outcomes pre-ordained. That is a conclusion that the Court is not prepared to reach at this juncture.

Plaintiffs also argue that this case is "presumptively suitable for judicial review" because "the disputed claims raise purely legal questions". The Court of Appeals for our Circuit has rejected an identical argument made in a very similar context, in turning away a challenge to a "Notice" published in the Federal Register by the Department of Energy, which set forth a method for allocating the costs of developing, constructing, and operating nuclear waste repositories between the government and commercial producers of such waste. *National Association of Regulatory Utility Commissioners, supra*, 851 F.2d at 1429. The Circuit Court concluded that, even if the challengers were correct that their case presented a purely legal question, that question was most appropriately addressed in a "more concrete and final" factual setting. *Id.* (quoting *State Farm, supra*, 802 F.2d at 479).[4] The Circuit Court

---

4. Further, the cases Plaintiffs cite make clear that the existence of a "purely legal question[ ]" is a necessary rather than sufficient prerequisite to ripeness. After the Court has determined that the case involves a "purely legal question", it then must "consider whether the court or the

reasoned that evaluating the claims at the time they were raised "may well prove to be no more than theoretical when petitioners revisit them in the context of a concrete application". *Id.* Since it was not clear that the challenged methodology " 'make[s] [a] difference' ", the court concluded that it was obligated to postpone review "until it is clear that judicial intervention is required, and will be consequential." *Id.*

The deferral of this action pending a concrete application of the Order and those implementing regulations which are finally adopted not only makes good jurisprudential sense, but is also compelled by well-settled law in this Circuit. For example, the Court of Appeals for the D.C. Circuit has denied review of Federal Communication Commission allotments [5] and regulations [6], proposed Occupational Health and Safety Administration regulations regarding cigarette smoke,[7] and proposed Nuclear Regulatory Commission regulations regarding public exposure to radiation [8]—all on the grounds that these cases were more properly examined in concrete rather than abstract settings. The analysis set forth in these cases compels a similar result in the case at bar.

Accordingly, it is clear that resolution of this case at this time would both "waste[ ] the court's time and interfere[ ] with the process by which the agency is attempting to reach a final decision." *Mount Wilson, supra,* 884 F.2d at 1466. For this reason alone, the Court is compelled to dismiss this case as unfit for judicial resolution.

### C. The Hardship Requirement

■ The second prong of the *Abbott Laboratories* test for ripeness requires that the contested action must "impose an impact on the parties 'sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage' ". *Alascom, supra,* 727 F.2d at 1217 (*quoting Abbott Laboratories, supra,* 387 U.S. at 152, 87 S.Ct. at 1517). "The mere *potential* for future injury, however, is insufficient to render an issue ripe for review." *Id.* (emphasis in original). That is, a case is not ripe if no "immediate response" to the regulation is required, and if no " 'irremediable adverse consequences' " would flow from the deferral of review until the regulation has been applied in a specific case. *Id.*

■ In this case, Plaintiffs have not demonstrated that they will suffer legally cognizable hardship from the withholding of immediate judicial consideration. Although Plaintiffs vigorously argue that the true "bite" of the Executive Order is felt immediately—during ongoing negotiations between labor and management, where Plaintiffs contend they will have to forego the formidable "bargaining chip" of hiring permanent replacements—this consequence, even if unavoidable,[9] is too remote to constitute imminent and irremedial harm.

As both the proposed regulations and the Executive Order itself make clear, the Order does not create an automatic bar to the hiring of permanent replacement workers, but rather, provides for an administratively layered system of case-by-case review in order to determine whether termination and/or debarment would be appropriate in the case of individual contracts and contractors. Thus, the Order does not—in the words of our Court of Appeals—create "a dilemma in

agency would benefit from postponing review until the policy in question has sufficiently 'crystallized' by taking on a more definite form." *City of Houston, supra,* 24 F.3d at 1431.

5. *Mount Wilson, supra,* 884 F.2d 1462.

6. *Alascom, Inc. v. FCC,* 727 F.2d 1212 (D.C.Cir. 1984).

7. *Action on Smoking and Health v. Department of Labor,* 28 F.3d 162 (D.C.Cir.1994).

8. *Public Citizen v. U.S. Nuclear Regulatory Commission,* 940 F.2d 679 (D.C.Cir.1991).

9. Defendant labels Plaintiffs' contention as "conclusory" and points out that the declarations submitted to the Court in support of their Motion for Preliminary Injunction fail to allege *how* the Executive Order will harm their position in collective bargaining negotiations. Defendant's Motion to Dismiss at 18. For example, Plaintiffs do not allege that, because of the Executive Order, they have had to, or will as a certainty have to, agree to contractual terms or make concessions that they would not otherwise agree to or make in any on-going labor dispute.

which a party 'must choose between disadvantageous compliance and risking serious penalties' for noncompliance." *Alascom, supra,* 727 F.2d at 1217 (internal citation omitted). Although the Order may in fact subject Plaintiffs to some amount of "disadvantageous compliance", the risk of "serious penalties" is simply too remote, speculative and intangible to constitute imminent harm. The harm perceived by Plaintiffs is, at best, "the mere *potential* for future injury", which has been deemed "insufficient to render [it] ripe for review". *Id.*

For example, under the Executive Order itself, even if the Secretary decides to investigate the labor practices of Plaintiffs, and even if the Secretary finds that any or all of the Plaintiffs have permanently replaced lawfully striking employees, the Secretary may still, in the exercise of his discretion, conclude that it would not be appropriate to terminate Plaintiffs' government contracts and/or debar any of the Plaintiffs from consideration for future government contracts. In that event, Plaintiffs would have suffered no harm from the Court's abstention at this time.

Further, if the Secretary did decide that the termination of one of Plaintiffs' contracts for convenience would be appropriate, the contract still would not be terminated if the head of the contracting department or agency objected. And, even if the Secretary proposed debarment, Plaintiffs would still be able to contract with the federal government if the head of a particular agency believed that there were a compelling reason to do so. If any of these scenarios occurred, Plaintiffs would have suffered no harm from the Court's abstention at this time.

Additionally, the proposed rules governing implementation of the Order provide that no debarment or termination for convenience can become effective until that proposed action has survived the multi-layered scheme of procedural safeguards and fact-finding. Specifically, both the Deputy Assistant Secretary and the Assistant Secretary must, first, make findings of fact—based on an investigation and/or hearing—that the contractor permanently replaced lawfully striking employees, and then must, second, make a recommendation based on the record that termination and/or debarment would be appropriate. Under the proposed rules, the contractor would then have the right to present information and/or argument in opposition to the recommended termination or debarment. If the Assistant Secretary finds that the contractor's submission raises a genuine issue of material fact, then the contractor has an opportunity to appear at a hearing. If the Assistant Secretary still decides on debarment or termination after the hearing, then the contractor has the right to challenge the decision as arbitrary or an abuse of discretion under the Administrative Procedure Act.[10]

With all of these procedural hurdles to overcome, and all of the opportunities for the contractor or the governmental entity to object, it is thus far from certain that any of the Plaintiffs (or their members) will lose any of their federal contracts pursuant to the Executive Order.

The Court of Appeals for this Circuit has relied upon similar reasoning in declining to review government policies when the challenged policy had not yet been applied to the party seeking review. *See, e.g., American Trucking Associations, supra,* 747 F.2d 787 (dismissing a challenge to an Interstate Commerce Commission policy statement regarding applications for permits to operate as motor contract carriers because the statement had not yet been applied to any of the Plaintiffs in a tangible way); *Alascom, supra,* 727 F.2d 1212 (dismissing as unripe a challenge to the Federal Communications

---

**10.** As discussed above, waiting for a concrete application of the Order makes sense for another reason: it may obviate the need for judicial review altogether. *FTC v. Standard Oil Co.,* 449 U.S. 232, 242, 244 n. 11, 101 S.Ct. 488, 494, 495 n. 11, 66 L.Ed.2d 416 (1980). Depending on the circumstances of the individual case, the Secretary or contracting agency heads may decide that there is a compelling reason not to stop doing business with a contractor, even though it has hired permanent replacements. "The present appeal simply gives petitioners two possible bites at the same apple." *Mount Wilson FM Broadcasters, supra,* 884 F.2d at 1466 (dismissing as unripe a similar request for pre-enforcement review of agency regulations, when, as here, it was uncertain that application of the regulations would impact the Plaintiffs adversely).

Commission's expression of intent to preempt states' regulations of new service that were inconsistent with federal policy, before such policy was applied to any particular inconsistent state law); *Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747 (D.C.Cir. 1984) (dismissing as unripe a challenge to an order of the Federal Energy Regulatory Commission which changed a Natural Gas Act interpretive rule because the rule was merely hypothetical and had not yet been applied to the detriment of the Plaintiffs); *Baltimore Gas & Elec. Co. v. ICC,* 672 F.2d 146 (D.C.Cir.1982) (dismissing as unripe a challenge to an Interstate Commerce Commission interpretive order, because the Plaintiff merely challenged the meaning of the order rather than a concrete application).

The one case decided by the Court of Appeals for our Circuit to which Plaintiffs point in support of pre-enforcement review is totally distinguishable from the circumstances of this case. In *Eagle–Picher, supra,* 759 F.2d 905, the Court allowed pre-enforcement review of an Environmental Protection Agency regulation—the Hazardous Ranking System ("HRS")—because a specific statutory provision evidenced clear Congressional intent for judicial review of the HRS before it was applied to specific environmental sites.[11] *Id.* at 916–17. In concluding that the challenge to the HRS was ripe before it was applied to any particular sites, the court noted that the statute called for notice-and-comment rulemaking, publication of both proposed and final revisions of the HRS in the Federal Register, and, most importantly, a statutory review provision that provided for judicial review of "any regulation promulgated under [CERCLA]" in the Circuit Court for the D.C. Circuit within "ninety days from the date of promulgation of such regulations." *Id.* at 910–11 (quoting 42 U.S.C. § 9613(a)). The statute, the court pointed out, "contains no equivocal language"; but rather, expressed the "strong Congressional preference for timing of review"—i.e., that such review take place after the regulations were finalized in HRS form, but before they were applied to specific sites to create the NPL. *Id.* at 917. In addition, the Defendant in that case—the EPA—agreed that pre-enforcement review would benefit the agency. *Id.* at 916. Finally, the Court noted that, from hindsight, it could confirm that resolution of the issue would not have been enhanced by the development of a more specific factual context. *Id.* at 917. As discussed above, none of those conditions are present in the instant case. Moreover, the Executive Order does not state a preference for pre-enforcement review of its implementing regulations, and, even if it did state such a preference, no pre-enforcement regulations have been finalized so that they could be reviewed.

Because Plaintiffs will suffer no tangible harm until the Executive Order is actually implemented and enforced—and even then, it is speculative whether they will suffer any harm at all—Plaintiffs' reliance on *Employers Association v. United Steelworkers,* 32 F.3d 1297 (8th Cir.1994), is misguided. In *Employers Association,* the Eighth Circuit invalidated the Minnesota Striker Replacement Law because the law deemed the practice of hiring permanent replacement workers an "unlawful act" in an across-the-board fashion, and subjected every employer that engaged in the practice to civil—and perhaps criminal[12]—penalties. 32 F.3d at 1298. Be-

---

**11.** *Eagle–Picher* involved a challenge to EPA regulations promulgated pursuant to a very different statutory scheme—the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et. seq.*—which specifically calls for two stages of administrative action and judicial review. *Id.* at 908–911.

In the first stage, CERCLA directs the EPA to design a Hazardous Ranking System ("HRS"), the designated model to be used by the EPA to determine how hazardous a site is and how much governmental interest should be taken in that site. *Id.* at 908, 910–11. In the second

stage, the EPA is instructed to apply the HRS, in its final form, to environmental sites, in order to produce a list of sites to be included in the National Priority List—a list of 400 sites that have been contaminated by harmful substances and that may warrant corrective action under CERCLA. *Id.* at 908, 911.

**12.** The parties in *Employers Association* disagreed as to whether a violation of the Striker Replacement Act rose to the status of a criminal act. 32 F.3d at 1298 n. 3. The Eighth Circuit concluded that resolution of that question was unnecessary to disposition of the case, and thus chose not to address it. *Id.*

cause the law applied to all employers without exception, and allowed for no flexibility to account for circumstances affecting individual cases, the Eighth Circuit concluded that mere enactment of the law had created tangible harm by "permanently and substantially" shifting the terms of bargaining in favor of unions. *Id.* at 1299. In sharp contrast, the Executive Order at issue in this case, as already discussed at length, is a far cry from such an "across the board" bar to the hiring of permanent replacement workers. Not only does it apply only to contractors who choose to contract with the government for contracts that exceed $100,000 in value, but it also applies, if at all, on a case-by-case discretionary basis.

The Executive Order also contrasts with the regulations in issue in *Abbott Laboratories, supra.* In *Abbott Laboratories,* the Supreme Court, concluding that the challenge to the regulations was ripe, emphasized that the regulations were "clear-cut, and were made effective immediately upon publication", and that noncompliance would subject them to "serious criminal and civil penalties". 387 U.S. at 153, 87 S.Ct. at 1517. In this case, as discussed above, the regulations are not clear cut, are not yet effective, have not even been adopted, and Plaintiffs risk no criminal or civil penalties upon the President's signing or the Secretary's enforcement of the Executive Order.

At bottom, then, any harm suffered by Plaintiffs will be "contingent upon executive discretion", and thus is too speculative and remote to satisfy the showing of hardship mandated by *Abbott Laboratories. Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 122–24, 94 S.Ct. 1694, 1698–99, 40 L.Ed.2d 1 (1974).

Accordingly, because Plaintiffs have failed to demonstrate that either the fitness or the hardship prong of *Abbott Laboratories* has been satisfied in the instant case, Defendant's Motion to Dismiss must be granted.[13]

*IV. Plaintiffs' Motion for Preliminary Injunction Must Be Denied*

■ In order to prevail on an Application for Temporary Restraining Order or a Mo-

tion for Preliminary Injunction, the Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors entry of a temporary restraining order. *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir. 1958) (per curiam); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir.1977); *Sea Containers, Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989); *National Treasury Employees Union v. United States,* 927 F.2d 1253, 1254 (D.C.Cir.1991). This Circuit's Court of Appeals has directed the trial court to balance, rather than mechanically apply, these factors. "A stay may be granted with either a high probability of success and some injury, or *vice versa." Cuomo v. United States Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C.Cir.1985) (*per curiam* ) (emphasis in original); *see also Holiday Tours, supra,* 559 F.2d at 843–44.

■ Application of the four factors stated above compels the conclusion that Plaintiffs' Motion for Preliminary Injunction must be denied.

First, as discussed in full above, because Plaintiffs' claim is not ripe for review, Plaintiffs' have failed to demonstrate any likelihood of success on the merits.

Second, Plaintiffs have not shown that they have suffered or will suffer any real or concrete, much less irreparable, injury as a result of promulgation of the Executive Order. In Plaintiffs' Motion for Preliminary Injunction, Plaintiffs argue that if injunctive relief is not entered, "federal contractors [will be] prohibited from hiring permanent replacements" and thus will be "substantially unable to continue operating at productive levels during a strike", causing such contractors to suffer "business losses". Since the Executive Order does not "prohibit" any activity whatsoever, and because the affidavits do not

---

**13.** Because the Court is granting Defendant's Motion to Dismiss, there is no reason to consider

Defendant's Motion for Summary Judgment (14–1).

establish that the hiring of permanent replacement workers is Plaintiffs' only means of avoiding business losses, this argument must be rejected.

Plaintiffs also allege that, "[b]ecause unions representing a federal contractor's workforce will know that the Order ties the employer's hands in the event of a strike,[14] the unions will be more demanding at the collective bargaining table and more willing to leave the table and go out on strike." In support of this rather broad generalization, Plaintiffs offer only the declarations of their own officers, the Vice Presidents of the Chamber of Commerce, the Labor Policy Organization, and Bridgestone/Firestone, all of which merely restate this same contention in suspiciously similar and conclusory language. These declarations simply do not establish the showing of imminent harm necessary to justify injunctive relief.[15]

Even if Plaintiffs are correct that they will suffer business losses if not allowed to hire permanent replacements for lawfully striking employees, such economic loss alone—in particular, theoretical economic loss—does not constitute irreparable harm. *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir. 1985).

Finally, the interests of the public outweigh those of Plaintiffs and thereby compel denial of preliminary injunctive relief. The public interest, as well as that of the Executive and Legislative Branches, favor economy and efficiency in government procurement. As discussed above, the Executive Order states on its face that it is designed to further these public interests.

It is well established that injunctive relief is an "extraordinary remedy." *See, e.g., Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Such relief is not warranted in this case. Plaintiffs' Motion for Preliminary Injunction must be denied.

*V. Conclusion*

For the reasons stated above, Plaintiffs' Motions for Preliminary Injunction and for Summary Judgment shall be **denied,** and Defendants' Motion to Dismiss shall be **granted.**[16]

**14.** This argument flows from Plaintiffs' earlier misreading of the clear language of the Executive Order, which does not purport to prohibit any activity and which does not create an automatic bar. Rather, as discussed in the text, the Order and proposed implementing regulations set out a case-by-case multi-layered discretionary system for determining whether it would be "appropriate" to terminate a contract or debar a contractor.

**15.** In particular, Charles R. Ramsey, Senior Vice President—Human Relations of Bridgestone/Firestone, Inc., testifies that losing the right to hire permanent replacement works renders agreement impossible, because "it is the credible threat of striking or hiring permanent replacements that gives labor and management (respectively) and incentive to reach agreement without resort to economic warfare." Ramsey Declaration, ¶ 16. However, the situation Mr. Ramsey describes in his declaration—where the parties could not reach agreement and the union went on economic strike—belies his contention that the threat of permanent replacement stops workers from striking, as the workers still chose to strike even though the company maintained

the "credible threat" of permanently replacing them. Ramsey Decl. ¶ 13.

**16.** The Court is well aware that at the conclusion of a lengthy oral argument on the dispositive motions, after excusing counsel, in response to a request from counsel regarding the manner in which the case would be handled procedurally, a promise was made that, whatever conclusion was reached on the procedural arguments, the Court would address the merits of the parties' claims. This was a hasty response which, from hindsight, now appears to have been ill-advised, especially in light of the reasoning and conclusions set forth in this opinion. As articulated, *supra,* there are sound policy reasons for courts refusing to adjudicate claims and render advisory opinions in cases which are premature and not yet ripe for full judicial review. Having reached the conclusion that this case is not ripe, the Court further concludes that it would be inappropriate to address the merits of Plaintiffs' substantive challenge to the validity of the Executive Order by issuing what would in effect be an advisory opinion. The Court regrets any expectations that may have been raised by the hasty comment made at the end of oral argument

before a final decision had been reached on any of the issues presented.