Stanley H. GOLDSCHMIDT, et al., Appellants,

v.

**PALEY ROTHMAN GOLDSTEIN ROSENBERG & COOPER, CHARTERED, et al., Appellees.**

Fischer Brewing Co., Inc., et al., Appellants,

v.

Alan S. Mark, et al., Appellees.

Arthur G. Kahn, Appellant,

v.

**Paley Rothman Goldstein Rosenberg & Cooper, Chartered, et al., Appellees.**

**Paley Rothman Goldstein Rosenberg & Cooper Chartered, et al., Appellants,**

v.

Benson J. Fischer, et al., Appellees.

Nos. 03–CV–1367, 04–CV–240, 04–CV–241, 04–CV–1118.

District of Columbia Court of Appeals.

Argued April 26, 2006.
Decided Nov. 8, 2007.

Tamir Damari, with whom Stanley H. Goldschmidt was on the brief, Washington, for appellants in No. 03–CV–1367.

Arthur G. Kahn, pro se, in No. 04–CV–241.

Frank J. Mastro for appellants in No. 04–CV–1118, and Frank J. Mastro, with whom Richard J. Magid was on the brief, for appellees in Nos. 03–CV–1367, 04–CV–240, and 04–CV–241.

Barry A. Haberman for appellants Fischer Brewing Company and Benson Fischer in No. 04–CV–240, and appellee Montgomery Bakers, Inc., in No. 04–CV–1118.

Richard E. Schimel for appellee Benson J. Fischer in No. 04–CV–1118.

Harvey A. Levin, Washington, for appellee Jill Flax, Personal Representative of the Estate of Howard L. Flax, in No. 04–CV–240.

Before RUIZ and FISHER, Associate Judges, and NEBEKER, Senior Judge.

FISHER, Associate Judge:

Benson J. Fischer sued Howard L. Flax; the law firm which represented him (Paley, Rothman, Goldstein, Rosenberg & Cooper ("Paley Rothman")); and Paley Rothman attorney Alan S. Mark for tortious interference with a proposed financial transaction that did not materialize. The trial court granted summary judgment in favor of Paley Rothman and Mark. After a brief trial, the court then awarded Paley Rothman, Flax,[1] and Mark nearly $1 million in damages on their counterclaims asserting that Fischer had engaged in bad-faith litigation. A jury also awarded Flax $300,000 on his *quantum meruit* claim. We affirmed these judgments in *Fischer v. Estate of Flax*, 816 A.2d 1 (D.C.2003) (*Fischer I* ).

These consolidated appeals involve further disputes related to those judgments. First, the trial court denied Fischer's mo-

tion to set aside the judgments awarding damages against him for bad-faith litigation. Second, the court denied a motion by Paley Rothman and Mark to enforce a writ of attachment served upon Montgomery Bakers, Inc. (MBI), a closely held corporation in which Fischer was a shareholder and an officer. Finally, the court sanctioned Fischer's attorneys, Stanley H. Goldschmidt and Arthur G. Kahn, for their part in facilitating Fischer's bad-faith litigation. We remand for further proceedings with respect to the writ of attachment, but otherwise affirm.

## I. Background

We thoroughly discussed the origins of this litigation in *Fischer I,* and offer an abbreviated version here. When Benson Fischer, a principal owner of Fischer Brewing Company, needed financing to expand the marketing and production of his products, his friend, Howard Flax, agreed to seek investors in exchange for a finder's fee. Flax and Fischer memorialized the arrangement in a Letter Agreement giving Flax the right to acquire up to 15% of the company's authorized stock if he found financing. Flax contacted Laidlaw & Co., an investment banking firm, which offered to underwrite an initial public offering of Fischer Brewing Company stock in exchange for a commission. After Laidlaw expressed interest, Fischer was informed that the fair practice rules of the National Association of Securities Dealers ("NASD") would prevent him from paying more than 15% of the gross offering proceeds to Flax and Laidlaw combined. Thus, Fischer could not compensate Laidlaw without either breaching his agreement with Flax or violating the NASD rules. After the Laidlaw deal fell through,

---

1. Howard Flax died before the case went to trial and was replaced in the litigation by the personal representative of his estate.

Fischer's company went out of business. Fischer then filed a complaint blaming Flax and Flax's attorney, Alan Mark of Paley Rothman, for the collapse of the Laidlaw deal.

Fischer complained that Flax, Paley Rothman, and Mark tortiously interfered with Fischer's potential deal with Laidlaw. Flax, Paley Rothman, and Mark responded by asserting claims against Fischer for abuse of process (bad faith litigation). Flax filed a counterclaim for *quantum meruit* damages to recover the fair value of the services he provided to Fischer before the Laidlaw deal fell through. Paley Rothman and Mark also sought Rule 11 sanctions against Fischer's attorneys, Kahn and Goldschmidt,[2] alleging that they lacked a good faith basis in fact for making the claims in the complaint. The court initially denied the motion for Rule 11 sanctions, noting that it was premature to make a decision. After a lengthy period of discovery, the court granted summary judgment in favor of Paley Rothman and Mark, finding "there is no legally viable theory or evidence" to support Fischer's claim for tortious interference.

Speaking through his attorney, Goldschmidt, Fischer refused to proceed with trial on the remainder of his case. As a result, the court entered judgment against Fischer on each of his claims against Flax and, after a brief jury trial, entered judgment in the amount of $300,000 on Flax's claim for *quantum meruit* damages. Following a bench trial on the bad faith litigation counterclaims, which Fischer did not attend and in which Goldschmidt did not participate, the court awarded Paley Rothman, Mark, and Flax some $930,000 in attorney's fees and costs, together with $40,000 in punitive damages.

Almost one year after we decided *Fischer I*, and over three years after the trial court entered the judgments against him, Fischer filed a motion to set aside the bad faith litigation and *quantum meruit* judgments. That motion was denied. In an effort to collect on its judgment, which remains unpaid, Paley Rothman served a writ of attachment upon MBI, a family-owned corporation of which Fischer was an officer and shareholder. After two days of hearings, the trial court denied the motion to enforce the writ of attachment.

Paley Rothman and Mark renewed their motion for Rule 11 sanctions after summary judgment was entered against Fischer on his tortious interference claim. Once all of the judgments against Fischer were affirmed, the trial court held a hearing on the renewed Rule 11 motion. On December 1, 2003, the court imposed sanctions against Goldschmidt and Kahn in the amount of $50,000 each. These appeals followed.

## II. The Rule 60(b)(6) Motion

Fischer asks us to reverse the decision *denying his motion to vacate*, asserting that his attorney was suffering from a mental infirmity when he refused to attend the trials himself and advised Fischer that he need not attend either.

### A. Facts

Trials were scheduled on the counterclaims filed by Flax, Paley Rothman, and Mark on dates between November 1999 and May 2000, but Fischer claimed that he was too ill to attend. Although the court previously had granted a seven-week postponement at Fischer's request, it refused to approve further continuances without

---

2. Mr. Kahn represented Fischer from July 11, 1997, to June 11, 1998, during which time he drafted and filed the amended complaint. Mr. Goldschmidt represented Fischer before and after Mr. Kahn did so.

credible evidence of Fischer's illness. Goldschmidt failed to offer such proof and refused to proceed without his client present. Thus, trials were conducted in the absence of Goldschmidt or Fischer on the defendants' counterclaims, with the results described above.

Fischer argues that the judgments should be vacated because, unbeknownst to him, Goldschmidt was suffering from a mental illness at the time the trials were scheduled to occur. Fischer attached an affidavit to his motion, swearing that he was not aware that Goldschmidt declined an opportunity to defend against these claims in Fischer's absence. Based on several material inconsistencies in affidavits that Fischer previously had submitted to the court, Judge Graae concluded that Fischer's affidavits "are not worth the paper they are written on." Judge Graae also noted that "Mr. Fischer comes with filthy hands seeking equity," citing instances where "he knowingly made false allegations against Mr. Flax, fabricated documents, tampered with witnesses, suborned perjury, and engaged in an elaborate cover-up to hide his misconduct."

### B. Standard of Review

■ Superior Court Civil Rule 60(b)(6) permits a court to grant relief from a judgment under "extraordinary circumstances or where a judgment may work an extreme and undue hardship." *Starling v. Jephunneh Lawrence & Associates,* 495 A.2d 1157, 1161 (D.C.1985); *see also Clement v. District of Columbia Dep't of Human Services,* 629 A.2d 1215, 1219 (D.C. 1993) ("in unusual and extraordinary situations justifying an exception to the overriding policy of finality"). "Whether to grant or deny a motion for relief under Rule 60(b)(6) is committed to the sound discretion of the trial court." *Puckrein v. Jenkins,* 884 A.2d 46, 60 (D.C.2005); *accord, e.g., Johnson v. Marcheta Investors*

*Ltd. Partnership,* 711 A.2d 109, 111 (D.C. 1998).

■ "In exercising its discretion, the trial court must choose 'what is right and equitable under the circumstances and the law' and state the reasons which support its conclusion." *Firemen's Ins. Co. of Washington, D.C. v. Belts,* 455 A.2d 908, 909 (D.C.1983) (quoting *Johnson v. United States,* 398 A.2d 354, 361 (D.C.1979)); *see Moorehead v. District of Columbia,* 747 A.2d 138, 157–58 (D.C.2000) (courts apply "equitable principles" when ruling on Rule 60(b) motions). The party seeking to set aside a judgment under Rule 60(b) bears the burden of demonstrating that he is entitled to such relief. *McCurry ex rel. Turner v. Adventist Health System/Sunbelt, Inc.,* 298 F.3d 586, 592 (6th Cir.2002) (cited in *Sieverding v. American Bar Ass'n,* 466 F.Supp.2d 224, 227 (D.D.C. 2006)); *United States v. International Brotherhood of Teamsters,* 247 F.3d 370, 391 (2d Cir.2001) ("The burden of proof is on the party seeking relief from judgment....").

### C. Analysis

We cannot say that the trial court abused its discretion by denying Fischer's motion to vacate judgment. The court's conclusion that Fischer's affidavits "are not worth the paper they are written on" is supported by a factual record replete with examples of Fischer's untrustworthiness. As the trial court noted, Benson Fischer has "filthy hands"; he cannot expect a new trial based solely on self-serving statements made over three years after the judgments were entered against him. These judgments were issued on the merits, after a lengthy period of discovery and trials, and were eventually affirmed by this court. To allow Fischer to relitigate these issues now would violate "the overriding

policy of finality" undergirding our legal system. *Profitt v. Smith*, 513 A.2d 216, 218 (D.C.1986) (quoting *Railway Express Agency, Inc. v. Hill*, 250 A.2d 923, 925 (D.C.1969) (citation omitted)).

 Alternatively, even if we assume the statements within his affidavit are true, the materials submitted in support of Fischer's motion fall far short of establishing that Goldschmidt was incapacitated by illness or that his illness caused the judgments against Fischer. Although the memorandum in support of his motion alleges that Goldschmidt "was suffering from an involuntary organic brain state causing impaired judgment," there are no attached affidavits, reports, or other sworn materials attesting to Goldschmidt's incapacity. Moreover, to obtain relief under Rule 60(b)(6) on the theory that an attorney's illness was an "extraordinary circumstance," the moving party must, at a minimum, show a causal nexus between the illness and the adverse ruling. *See Douglas v. Kemp*, 721 F.Supp. 358, 360 & n. 4 (D.D.C.1989) (the court must focus on the effect of the attorney's illness on the client's case).[3] In light of these omissions, we cannot say Fischer established "extraordinary circumstances" that warrant new trials.

 Fischer voluntarily chose Goldschmidt as his attorney and "cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Fischer "is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." *Id.* at 634, 82

S.Ct. 1386 (internal quotation marks and citation omitted); *see Molovinsky v. Monterey Coop., Inc.*, 689 A.2d 531, 534 n. 7 (D.C.1996) ("clients must be held accountable for the acts and omissions of their attorneys") (internal punctuation and citation omitted). Although we have recognized an exception to this rule "where the conduct of counsel is outrageously in violation of either his express instructions or his implicit duty to devote reasonable efforts in representing his client," *Railway Express Agency, Inc.*, 250 A.2d at 926; *see also Clark v. Moler*, 418 A.2d 1039, 1042 (D.C.1980); *Bond v. Wilson*, 398 A.2d 21, 24–25 (D.C.1979), "nothing in this record even approaches a situation warranting the application of this exception." *Newsome v. District of Columbia*, 859 A.2d 630, 631 (D.C.2004).

 Fischer's own affidavit belies any claim that he has only recently discovered his attorney's actions. Fischer recites that "I was advised by Stanley Goldschmidt not to attend the hearing on the bad faith litigation claims of the Defendants and that neither he nor anyone from his office would be present as their attendance was not required or necessary." Soon after he accepted this advice, substantial judgments were entered against him. Although the trend of the litigation obviously was unfavorable, Fischer apparently believed that their strategy ultimately would prevail. He relied upon "Mr. Goldschmidt's representations to me that I would prevail on every issue on appeal...." Although Fischer's new counsel has explained the defects in Goldschmidt's legal advice, that does not change the fact that Fischer was aware of Goldschmidt's conduct. *Cf. Unit-*

---

**3.** During the previously-held Rule 11 proceedings against Goldschmidt and Kahn, the court heard the testimony of Goldschmidt's psychiatrist, Dr. Wayne Blackmon. Although "the court found [Dr. Blackmon's] testimony quite persuasive" that Goldschmidt had a mental health problem, Goldschmidt did not "establish[ ] any nexus between his mental condition and professional conduct."

*ed States v. Pollard,* 367 U.S.App. D.C. 386, 393, 416 F.3d 48, 55 (2005) (for purposes of federal statute of limitations, time begins to run when prisoner knows (or through diligence should know) of his attorney's conduct, not when new counsel reveals the legal significance of those facts). We will not reward a party with a new trial where he was aware of "his counsel's derelictions [but] failed to take diligent measures to protect his own interests." *Joseph v. Parekh,* 351 A.2d 204, 205–06 (D.C.1976); *see also Bond v. Wilson,* 398 A.2d at 24 (movant must demonstrate that he "was assiduous in pursuing his claim"); *Railway Express Agency, Inc.,* 250 A.2d at 927 (court properly denied motion to vacate where party negligently monitored the status of his case, waiting twenty months to contact attorney regarding status, only to discover that case had been dismissed due to his attorney's negligence). Except in extraordinary circumstances (not demonstrated here), "if an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice." *Link,* 370 U.S. at 634 n. 10, 82 S.Ct. 1386.

### III. The Writ of Attachment— D.C.Code § 16–579

#### A. The Factual and Procedural Background

Incorporated in June 2001, approximately six months after the judgments for bad faith litigation were entered against Fischer, MBI was formed to acquire substantially all of the assets of Montgomery Doughnuts, Inc., a bankrupt bakery. On October 8, 2001, Paley Rothman served a writ of attachment directing MBI to withhold "25% of [Benson Fischer's] disposable wages for each workweek or other pay period." MBI filed an answer, *see* D.C.Code § 16–551 (2001), stating that it

did not employ Fischer and had paid no salary or wages to him. MBI also answered interrogatories, and Paley Rothman requested a traverse hearing pursuant to D.C.Code § 16–553.

After hearings were held on July 18, 2002, and October 22, 2003, the court found that MBI "is owned by Benson Fischer, his wife Mona Fischer (holding a 50% joint interest) and his parents Sheldon and Ann Fischer (each owning a 25% interest)." Benson and Mona Fischer had loaned MBI $310,000 when it was established. Benson Fischer served as president of the corporation and "assum[ed] primary responsibility for marketing, promotion, product development, franchising, purchasing equipment, contracting with vendors, and overseeing the legal affairs of the company." The business closed in February 2003 after its roof collapsed following a heavy snowfall. Nevertheless, Fischer continued to work on behalf of MBI, negotiating with insurers and others while attempting to revive the business. The record had not been supplemented to show the current state of affairs, so the court did not know if MBI had reopened.

From October 8, 2001, when the writ of attachment was served on MBI, through August 21, 2003, Benson Fischer had drawn checks from MBI accounts totaling $244,620. The money typically came in monthly payments of $8,957. Fischer characterized those amounts as repayments of the $310,000 loan, rather than salary for his work on behalf of the company. The court was tempted "to conclude that Benson Fischer's repayment arrangements with MBI are just part of his scheme to keep Paley Rothman, Mark, and Flax from satisfying their judgments." Having heard the testimony, however, it was persuaded "that MBI was set up financially in the same way Mr. Sheldon Fischer had set up his other businesses

over the years: i.e. providing loans to start up the companies, repaying these loans as cash flow is generated before taking salaries and profits." "[T]he court credit[ed] the Fischers' assertions that MBI was capitalized without regard to this lawsuit and that Benson and Mona Fischer were repaid monthly in capital and interest on their original $310,000 loan." Nevertheless, "it [was] evident that Benson Fischer took his monthly draw to meet the living needs of his family."

Paley Rothman had presented expert testimony to assist in determining the fair market value of Fischer's services, but the court made no finding on this question. "The amounts he drew would not reflect a full salary for comparable work, ... but might well be reasonable for an executive/owner during the start-up period of a new business." "[T]he court [was] loath without further evidence to second-guess the judgment of a businessman that he can survive on less than normal while his business is being established."

### B. Legal Analysis

Seeking to collect at least part of the judgment Fischer owed, Paley Rothman relied upon D.C.Code § 16–579 (2001), which provides:

> **Payments by employer-garnishee where employee has no salary or salary inadequate for services rendered.**
>
> Where the judgment debtor claims or is proved to be rendering services to or employed by a relative or other person or by a corporation owned or controlled by a relative or other person, without salary or compensation, or at a salary or compensation so inadequate as to satisfy the court that the salary or compensation is merely colorable and designed to defraud or impede the creditors of the debtor, the court may direct the employer-garnishee to make payments on account of the judgment, in installments, based upon a reasonable value of the services rendered by the judgment debtor under his employment or upon the debtor's then earning ability.

There was no dispute that Fischer rendered services to MBI—according to his own testimony and that of his father, he worked long and hard, sometimes seven days a week. There also seems to be no dispute that he served without salary or compensation. The question is whether those facts are sufficient to trigger application of the statute or whether Paley Rothman was obliged to demonstrate as well that the absence of salary was "designed to defraud or impede the creditors of the debtor."

There is no infallible rule for answering such questions of statutory construction, but we have often found "guidance in the 'Rule of the Last Antecedent,' which is that 'ordinarily, qualifying phrases are to be applied to the words or phrase immediately preceding them, and not to others more remote.'" *Evans v. Medical Inter–Insurance Exchange*, 856 A.2d 609, 613 (D.C.2004) (quoting *Perkins v. District of Columbia Bd. of Zoning Adjustment*, 813 A.2d 206, 209 n. 5 (D.C.2002) (additional citation omitted)). *Accord, District of Columbia v. Smith*, 329 A.2d 128, 130 (D.C.1974); *United States v. Pritchett*, 152 U.S.App. D.C. 307, 311, 470 F.2d 455, 459 (1972). This "rule is not inflexible, and is not applied if the context in question suggests a different meaning." *Evans*, 856 A.2d at 613.

In this case, applying the Rule of the Last Antecedent points to the conclusion that the qualifying words "designed to defraud or impede the creditors of the debtor" modify "a salary or compensation so inadequate" and not the more remote phrase "without salary or compensation." However, we need not rely on this gram-

matical rule alone. "We are materially assisted by the punctuation of the statute." *MacFarland v. Elverson,* 32 App. D.C. 81, 87 (1908). *See In re Rosen,* 570 A.2d 728, 729 (D.C.1989) ("The provision is clearly stated in the disjunctive, with the relevant clauses set off by commas.").[4] The crucial clause—"or at a salary or compensation so inadequate as to satisfy the court that the salary or compensation is merely colorable and designed to defraud or impede the creditors of the debtor"—is separated from the rest of the statute by commas. If this clause were deleted, the statute would grammatically and sensibly read:

> Where the judgment debtor ... is proved to be rendering services to or employed by ... a corporation owned or controlled by a relative or other person, without salary or compensation, ... the court may direct the employer-garnishee to make payments on account of the judgment, in installments, based upon a reasonable value of the services rendered by the judgment debtor under his employment or upon the debtor's then earning ability.

Under this construction, the statute would apply in situations like this, when the judgment debtor is working without salary or compensation. There would be no need to prove that the arrangement was "designed to defraud or impede ... creditors."

The parties have not cited, and we have not found, any legislative history which would undercut this "plain language" reading of the statute.[5] Nor does case law require a different interpretation. Indeed, on the one occasion when we have construed this statute, we required a family corporation to make payments on behalf of its president. In *IBF Corp. v. Alpern,* 487 A.2d 593 (D.C.1985), the judgment debtor was serving, without salary, as president of a corporation owned by his wife and two adult children. Applying § 16–579, we upheld a trial court order requiring the corporation to pay monthly installments until the judgment was satisfied.

In *IBF Corp.,* we did not address the issue of statutory construction now before us, but we did explain, in passing, that "[t]he statute is designed to permit a levy against the corporate fisc when a debtor who renders services to the corporation takes inadequate, if any, compensation—and thus presumably leaves his or her money in the corporation—*in order to defraud or otherwise impede personal creditors.*" *Id.* at 597 (emphasis added). The italicized words seem to support Fischer's position, but they appear to be mere dictum. There is no discussion of the issue presented here, and, when the opinion summarizes the trial court's findings, there is no reference to an intent to defraud or impede creditors. *Id.* (Under the interpretation of the statute espoused by MBI and Fischer, such a finding would have been necessary in order for us to affirm the order requiring payments.)

---

4. In *Rosen* we interpreted former Disciplinary Rule 1–101(A), which provided: "A lawyer is subject to discipline if he has made a false statement in, or if he has deliberately failed to disclose a material fact in connection with, his application for admission to the bar." Focusing on the "language and syntax" of the rule, we concluded that "the requirement of deliberateness is conspicuously absent from" one of the "alternative ground[s] for sanctions." 570 A.2d at 729.

5. We previously have explained that the legislative history of § 16–579 is "sparse." *IBF Corp. v. Alpern,* 487 A.2d 593, 596 (D.C.1985). It appears that the statute is modeled after section 793 of New York's Civil Practice Act. *See In re Brecher,* 19 F.Supp. 283 (S.D.N.Y. 1937). A few jurisdictions have comparable statutes, but we have not found any case addressing the issue of statutory interpretation presented here.

The Bankruptcy Court for this district has also interpreted § 16–579. The pertinent discussion may be dictum, and would not be binding upon us in any event. Nevertheless, the court carefully construed the statute and focused on the question that confronts us here. The court acknowledged "that § 16–579 does contain the words 'defraud or impede.' But those words do not apply to the case of an employee working for free." *In re Schneiderman*, 251 B.R. 757, 766 (Bankr. D.D.C.2000). The court concluded that the statute applies only to services rendered post-attachment and that this "explains why § 16–579 failed to impose the same 'defraud or impede' limitation in the case of free services: once a writ is served and the judgment-debtor then renders her services for free, the judgment-creditor is necessarily being impeded and defrauded." 251 B.R. at 766.

In *Phillips v. Sugrue*, 886 F.Supp. 63 (D.D.C.1995), the United States District Court refused to compel payments pursuant to D.C.Code § 16–579, but that decision is readily distinguishable (and, in any event, it does not bind us). Ms. Phillips was attempting to collect a tort judgment against a priest who was then living "in community" at the Marist Society in the District of Columbia. Father Sugrue, who had taken a vow of poverty, worked as a full-time business manager for the society, but received no compensation for his services. There was no evidence that the Marist Society ordinarily compensated its members with wages or was "liable to the debtor." 886 F.Supp. at 65 (quoting *IBF Corp.*, 487 A.2d at 596). "The Marist Society relie[d] on canonical law for its position that a 'religious' has no enforceable right to be compensated for services rendered to a religious institute, even though the institute has undertaken to furnish for its members all things that are necessary for achieving the purpose of their vocations."

886 F.Supp. at 65. Adjudicating that issue would present difficult First Amendment issues. Moreover, in *IBF Corp.* "the judgment debtor was the owner and president of the corporate garnishee—a controlling person, unlike Fr. Sugrue." *Id.* at 64.

Here, by contrast, Fischer is a controlling insider in a for-profit business enterprise. There are no First Amendment obstacles to adjudicating the question of whether MBI can be required "to make payments on account of the judgment, in installments, based upon a reasonable value of the services rendered by" Fischer. D.C.Code § 16–579. He is more similarly situated to the judgment debtor in *IBF Corp.* than to Father Sugrue.

Paley Rothman does not argue that the "loan repayments" were, in fact, disguised salary. Rather, it highlighted these payments simply to demonstrate that MBI had money available to make payments to Fischer each month. The Trustee for the Bankruptcy Estate of Benson Fischer (somewhat curiously aligned in this litigation with Paley Rothman) makes the same argument: "The shareholder agreement obligates MBI to make loan repayments only when there is a positive cash flow. Since MBI issued loan repayments to Fischer every single month, it is clear that the company had a positive net cash flow each month. Thus, instead of making loan repayments, the company easily could have directed its excess cash flow to pay Fischer a salary which would have been subject to attachment." This aspect of the issue has not been fully briefed, and we do not decide it now, but it may develop, after further litigation in the trial court, that MBI must make payments on the judgment before it repays the loan from Fischer. We reject the argument that such an outcome would involve our courts impermissibly in the governance of a Maryland corporation. This is not an issue of corpo-

rate governance, but a question of interpreting statutory remedies available to judgment creditors.[6]

MBI and Fischer protest that Paley Rothman cannot have any greater rights against MBI than Fischer does, *see Phillips v. Sugrue*, 886 F.Supp. at 64, and they assert that Fischer could not successfully sue MBI to recover the value of his services. They argue, in essence, that Fischer may thwart his judgment creditors' use of § 16–579 simply by *agreeing* that he will work for free. We disagree. The plain language of the statute focuses simply on whether "the judgment debtor ... is ... rendering services ... without salary or compensation...." Indeed, in *IBF Corp.* we upheld the order requiring the corporation to make payments without discussing whether Mr. Frishman (the judgment debtor) could successfully have sued IBF to recover the value of his services.

The statute does repose discretion in the trial court when it provides that "the court *may direct* the employer-garnishee to make payments...." D.C.Code § 16–579 (emphasis added). *See In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991) ("the word 'may' ... is quintessentially permissive"). In determining whether and how to exercise that discretion, the court may consider the reasons why no compensation is being paid. Similarly, there may be many factors that help the court determine the "reasonable value of the services ren-

dered...." D.C.Code § 16–579. One such factor might be that the arrangement was in place, as the trial court noted, "during the start-up period of a new business."

We conclude, in sum, that the plain language of the statute does not require Paley Rothman to prove that the financial arrangements between MBI and Fischer were "designed to defraud or impede" his creditors. "[T]hose words do not apply to the case of an employee working for free." *In re Schneiderman*, 251 B.R. at 766. The trial court therefore erred in interpreting the statute. We cannot uphold the court's ruling as discretionary because an exercise of judicial discretion "must ... be founded upon correct legal principles...." *In re J.D.C.*, 594 A.2d at 75. We remand for further proceedings, including a determination of the reasonable value of the services rendered by Fischer to MBI from October 8, 2001, to the present.[7]

## IV. Rule 11 Sanctions

Arthur Kahn and Stanley Goldschmidt argue that the trial court abused its discretion by imposing Rule 11 sanctions against each of them. They maintain that there was a factual basis for the assertions made in the original and amended complaints and that Paley Rothman failed to comply with the "safe harbor" requirements of Rule 11(c)(1)(A). Kahn particularly ar-

---

6. MBI does not challenge the authority of District of Columbia courts to enforce the writ against a Maryland corporation, presumably because the writ was served on the corporation's Registered Agent in the District of Columbia, Stanley Goldschmidt. Power over the person of the garnishee confers jurisdiction to enforce a writ of attachment. *Marvins Credit, Inc. v. General Motors Corp.*, 119 A.2d 447, 448 (D.C.1956) (court could enforce writ when debtor was a resident of Maryland, worked in Maryland, and was paid in Mary-

land; employer General Motors was served at its District of Columbia office).

7. We are not persuaded by Paley Rothman's argument that the court abused its discretion by admitting expert testimony from Bruce Pollekoff, an accountant called by MBI. The court was well aware that Pollekoff had not studied the books and records of MBI, but was testifying more generally about capitalization of small businesses. The court was fully capable of evaluating this testimony and accepting it for what it was worth.

gues that the court erred by imposing sanctions against him although he no longer represented Fischer and thus lacked authority to withdraw the amended complaint; in any event, he believes the court erred when it determined the amount of sanctions to be imposed.

## A. Pertinent Facts

Although the Rule 11 sanctions grow out of Benson Fischer's dispute with Howard Flax, they are not based on his decision to sue Flax for tortious interference with prospective business advantage, but rather on his extraordinary decision to sue Flax's attorneys as well. The original complaint, drafted by Stanley Goldschmidt, accused Alan Mark and Paley Rothman of tortious interference, extortion and attempted extortion, aiding and abetting tortious activity, and conspiracy.

Arthur Kahn began representing Fischer after Mr. Goldschmidt withdrew from the case on May 30, 1997. See note 2, *supra*. Shortly after taking over, Kahn argued against dismissal of the original complaint, asserting that "[w]e've alleged point-blank that the defendant lawyer himself, in it for himself, intentionally interfered with our prospective economic advantage.... [W]e assert [that] you were in it for yourself, ... you did it with malice and spite and ill will." "These allegations, if accepted as true, definitely state a legally cognizable claim against the lawyer and the law firm." Judge Bowers disagreed and dismissed all counts against Mark and Paley Rothman. As the court explained, there was nothing "to indicate that Mark did anything other than represent his client in reference to that fee."

Shortly thereafter, Mr. Kahn filed an amended complaint,[8] renewing the claim that Mark and Paley Rothman were guilty of tortious interference with the Laidlaw proposal. He specifically alleged that "Mark took the aforesaid actions on his own behalf and that of Paley Rothman, outside the scope of his purported employment by the Flax Defendants as their attorney, for his sole personal benefit with the specific intent to injure and damage the plaintiffs, knowing full well that the Flax Defendants' said actions were without legal justification and unlawful." In context it is clear that these allegations were designed to meet the requirements of *Fraidin v. Weitzman*, 93 Md.App. 168, 611 A.2d 1046 (1992), a case we will discuss below.

On January 21, 1998, Paley Rothman served both Kahn and Goldschmidt with a copy of its draft motion for sanctions pursuant to Rule 11, asserting that there was no factual basis for the allegations in the amended complaint. A month later, on February 20, Paley Rothman filed its motion in the Superior Court. Kahn withdrew from the case in June. When Goldschmidt re-entered the case in July 1998, Paley Rothman wrote him, asking that he withdraw the claims against it. He did not do so, but filed three supplemental oppositions to the Rule 11 motion, "one more obdurate than the next," according to Judge Graae. On July 24, 1998, Judge Graae denied the motion for sanctions as "prematurely filed," noting that "it is obvious that sanctions might only apply if the complaint against these defendants were dismissed or summary judgment granted." After summary judgment was entered

---

8. Judge Bowers stated his intention to dismiss with prejudice the claims against Mark and Paley Rothman. However, Mr. Kahn persuaded the court to order dismissal without prejudice so he could amend the complaint to include a specific factual basis for concluding that Mark acted with animosity or fraud.

against Fischer, Paley Rothman renewed its motion for Rule 11 sanctions.

On October 8, 2003, Judge Graae held a day-long hearing on the matter. Stanley Goldschmidt testified that a period of approximately six months elapsed between the time he was retained by Benson Fischer and the filing of the original complaint. He described the steps he had taken to investigate the legal and factual bases for claims against Mark and Paley Rothman. He had studied the decision in *Fraidin* and relied on his understanding that an attorney's "malice can be inferred by merely taking a position ... against an opposing party without legal justification." After he re-entered the litigation, he reviewed the amended complaint and saw that Mr. Kahn had also taken the position "that Mr. Mark was acting for his own benefit."

At the hearing, Mr. Kahn summarized his reasons for making the allegations against Mark and Paley Rothman. "I base[d] it on the fact that there was no valid claim for this commission, that it was pursued therefore without any merit and the motivation I could only construe for an attorney like Mr. Mark, qualified as he was, was for some personal animus that had been engendered by the invective heaped upon him by Mr. Fischer and by his friendship with Mr. Flax." As Kahn explains in his brief, "Fischer alleged that Mark's malice came from within, because he took Fischer's conduct toward himself and his friend [Flax] personally."

Judge Graae considered "the professional conduct of Mr. Goldschmidt and Mr. Kahn to be well beyond the pale. These two experienced lawyers knew, or had to know, they did not have sufficient evidence to make a case for tortious interference by Mr. Mark and his firm, Paley Rothman." "The essence of Fischer's claims against Paley Rothman [was] that Mr. Mark was

representing his friend Howard Flax on a claim of compensation to which he had no legal entitlement and, thus, Mr. Mark's only motivation could have been to do harm to Fischer." As evidence of Mark's malice, "Mr. Goldschmidt and Mr. Kahn [had] the audacity to suggest that Mr. Fischer's abusive and threatening conduct so angered Mr. Mark that he was provoked into a legally indefensible representation of Mr. Flax for the malicious purpose of damaging Fischer." Alternatively, Goldschmidt implied that Mark was being paid under a contingency agreement or had a financial interest in the Letter Agreement underlying Flax's claim. The trial court dismissed "[t]hese speculative theories about Mr. Mark's motives [because they] were never substantiated by a single fact." Even after discovery "render[ed] their claims insupportable," Mr. Goldschmidt and Mr. Kahn "rejected opportunities to correct and amend their pleadings." "The court [could] only characterize their conduct as willful and badly motivated."

The court decided that "[m]onetary sanctions [were] clearly appropriate." Although Paley Rothman had spent $723,187 defending itself, and Mark invested more than 600 hours of uncompensated time assisting the firm in defending the claims against him, the court did not attempt to "balanc[e] the books." Considering the purpose of Rule 11 sanctions, and the limited resources of Goldschmidt and Kahn, the court concluded that a sanction of $50,000 each would be "an amount sufficient to serve as a meaningful deterrent." The court apportioned the sanction equally because it did not "find[ ] either lawyer more or less culpable than the other."

Mr. Kahn filed a motion to vacate, alter, or amend the judgment, appending his own affidavit and excerpts of deposition

testimony. The court denied the motion, observing:

> Mr. Kahn persists in missing the point. He failed to conduct a proper factual investigation before filing [the amended complaint] reinstating Fischer's claims against Mr. Mark and Paley Rothman. There was no factual support for the claim before he filed it, and none materialized later.

Indeed, rather than supporting the claims, discovery revealed that there was no factual basis for them, and Mr. Kahn "should have removed his blinders, faced up to the insubstantiality of the claim against Paley Rothman, and dismissed it from the case."

## B. Standard of Review

 "This court reviews for abuse of discretion both a trial court's determination that Rule 11 was violated and the amount of sanctions ordered." *Cunningham v. Bathon,* 719 A.2d 497, 499 (D.C. 1998); *see also, e.g., Williams v. Board of Trustees of Mount Jezreel Baptist Church,* 589 A.2d 901, 910 & n. 12 (D.C.1991). "Rule 11 imposes an obligation to conduct a reasonable inquiry prior to filing a complaint so as to ensure that the allegations and other factual contentions have evidentiary support." *Breezevale Ltd. v. Dickinson,* 879 A.2d 957, 963 n. 6 (D.C.2005) (emphasis omitted). Although we "must

grant wide discretion" to a trial court in determining that a pleading is factually groundless, *Cunningham,* 719 A.2d at 499, we will hold that the court abused its discretion if it based its decision on a clearly erroneous evaluation of the evidence. *Kleiman v. Kleiman,* 633 A.2d 1378, 1383 (D.C.1993). "The concept of 'exercise of discretion' is a review-restraining one. [Our] role in reviewing the 'exercise of discretion' is supervisory in nature and deferential in attitude." *Johnson v. United States,* 398 A.2d 354, 362 (D.C. 1979).

## C. The Court Properly Imposed Sanctions

 Civil Rule 11 allows the Superior Court to impose sanctions on an attorney who has presented a pleading without evidentiary support or for "any improper purpose." [9] The reasonableness of the attorney's inquiry depends on the circumstances of the case. "An inquiry that is unreasonable when an attorney has months to prepare a complaint may be reasonable when he has only a few days before the statute of limitations runs." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 401–02, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (quoted in *Gray v. Washington,* 612 A.2d 839, 843 (D.C.1992)). Moreover,

---

**9.** At the time of this litigation, Rule 11(b) provided:

> (b) *Representations to court.* By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2) the claims, defenses, and other legal contentions therein are warranted by exist-

ing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Super. Ct. Civ. R. 11(b) (1995 Supp.).

"Rule 11 sanctions are not to be imposed simply because the allegations in the challenged pleading are found wanting." *Bredehoft v. Alexander*, 686 A.2d 586, 594 (D.C.1996) (internal quotation marks and citation omitted).

Although we eschew the benefits of "20/20 hindsight," *Park v. Sandwich Chef, Inc.*, 651 A.2d 798, 803 (D.C.1994); *accord, Kleiman*, 633 A.2d at 1382, we no longer limit our scrutiny to the pre-filing investigation. The "1993 amendment to [federal] Rule 11 [adopted by the Superior Court in 1995] emphasizes an attorney's continuing obligation to make inquiries, and thus the rule allows sanctions when an attorney continues 'insisting upon a position after it is no longer tenable.'" *Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997) (quoting FED.R.CIV.P. 11, Advisory Committee Notes (1993 Amendment)). *Accord, Morris v. Wachovia Securities, Inc.*, 448 F.3d 268, 279 (4th Cir.2006); *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir.1997) (Rule 11 "embrac[es] a continuing duty of candor").[10] The Advisory Committee Notes to the federal rule explain:

> The rule continues to require litigants to 'stop-and-think' before initially making legal or factual contentions. It also, however, emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable and by generally providing protection against sanctions if they withdraw or correct contentions after a potential violation is called to their attention.... [A] litigant's obligations with respect to the contents of [its] papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.... [I]f evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention.

FED.R.CIV.P. 11, Advisory Committee Notes (1993 Amendment Subdivisions (b) and (c)).

### 1. "Safe Harbor" Notice Was Given

A party intending to move for sanctions under Rule 11 first must give his opponent an opportunity to withdraw or correct the offending pleading or allegation. A draft of the motion "shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Super. Ct. Civ. R. 11(c)(1)(A) (1995 Supp.). The "purpose of the 'safe harbor' provision is to give an opposing party the opportunity to admit candidly that it cannot support its contention, and withdraw that position before the Rule 11 motion has been filed with the court." *Goldberg, Marchesano, Kohlman, Inc. v. Old Republic Surety Co.*, 727 A.2d 858, 864 (D.C.1999) (citing FED.R.CIV.P. 11, Advisory Committee Notes (1993 Amendment)). "This court has required compliance with the safe harbor provision in order for sanc-

---

**10.** We repeatedly have looked to cases interpreting FED.R.CIV.P. 11, and to the Advisory Committee Notes explaining that rule, when applying Super. Ct. Civ. R. 11. *See, e.g., Olivarius v. Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc.*, 858 A.2d 457, 469 (D.C.2004); *Peddlers Square, Inc. v. Scheuermann*, 766 A.2d 551, 556 n. 4 (D.C. 2001); *Goldberg, Marchesano, Kohlman, Inc. v. Old Republic Surety Co.*, 727 A.2d 858, 864 (D.C.1999); *Bredehoft v. Alexander*, 686 A.2d 586, 593 (D.C.1996).

tions to be awarded pursuant to Rule 11." *In re Jumper*, 909 A.2d 173, 175 (D.C. 2006) (citation omitted).

▪ A party cannot initiate the Rule 11 process after judgment has been entered. Under such circumstances, there would be no way to provide the twenty-one day notice and opportunity for correction required by the "safe harbor" provision of Rule 11(c)(1)(A). For example, in *Goldberg*, we held that "the motion for sanctions must be served on the opposing party while the opposing party still has the opportunity to correct the offending position or papers." 727 A.2d at 864. In that case, the movant "filed her Rule 11 motion six weeks after [the Superior Court] rendered summary judgment. At that time, there were no papers, claims, or contentions pending before the judge which GMK could have withdrawn or corrected in response to the motion." *Id. See also Roth v. Green*, 466 F.3d 1179, 1193 (10th Cir. 2006) (and cases cited therein; Rule 11 motions should have been denied because they were not filed until after the district court had dismissed the complaint); *Ridder v. City of Springfield*, 109 F.3d at 297 ("Quite clearly then, a party cannot wait until after summary judgment to move for sanctions under Rule 11.").

▪ This case is unusual because the trial court dismissed the initial Rule 11 motion as premature rather than holding the motion in abeyance. After summary judgment had been granted against Fischer, Paley Rothman renewed its motion for sanctions. Appellants protest that there was nothing they could do at that point to withdraw their offending pleadings and

that they therefore were deprived of their safe harbor warning. We disagree.

The procedural posture of this case is similar to that considered in *Divane v. Krull Electric Co., Inc.*, 200 F.3d 1020 (7th Cir.1999). There, as here, the trial court dismissed the first Rule 11 motion as premature because it could not rule on the issue of sanctions until certain factual disputes were resolved. After judgment had been entered, a second Rule 11 motion was filed, and the court awarded sanctions. Although acknowledging that "taking [the] motion under advisement pending the resolution of the factual dispute would have been a more appropriate method," the Seventh Circuit concluded "that Trustees effectively complied with the twenty-one day safe harbor provision of Rule 11(c)(1)(A), and the dismissal of Trustees initial motion to sanction Curry as premature did not extinguish this effective notice." *Id.* at 1027.[11] *Accord, Holgate v. Baldwin*, 425 F.3d 671, 678 (9th Cir.2005) (initial motion was denied without prejudice in 2002: "We hold that Levinson received all the process due to him when Baldwin initially satisfied the safe harbor requirements of Rule 11. There was no need for Baldwin to satisfy a second safe harbor period when he re-filed his Rule 11 motion in 2003."); *see also Hamil v. Mobex Managed Services Co.*, 208 F.R.D. 247, 250 (N.D.Ind.2002) ("[A] motion for sanctions may be filed with the court after judgment as long as the moving party has first served the motion for sanctions on the offending party twenty-one (21) or more days prior to final judgment."); *Powell v. Squire, Sanders & Dempsey*, 990 F.Supp. 541, 542–43, 545 (S.D.Ohio 1998) ("safe harbor" provision was complied with when copy of proposed

---

**11.** The district court in *Divane* had concluded that no safe harbor notice was required in the circumstances of that case, see 1998 WL 150726 (N.D.Ill.1998), but we rejected that reasoning in *Goldberg*, 727 A.2d at 864. Several months later, the Seventh Circuit rejected that reasoning as well. Nevertheless, the court of appeals upheld the imposition of sanctions for the reasons discussed above.

Rule 11 motion was served on opposing counsel approximately four months before court granted judgment on the pleadings, but motion was not filed until after judgment was granted), *aff'd in relevant part,* 182 F.3d 918 (6th Cir.1999); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 1337.2, at 730 (2004) ("[A] motion for sanctions may be filed with the district court after a dismissal or a final order in the actions if the Rule 11 motion was served upon the opposing party at least twenty-one days before the dismissal or judgment.").

Here Kahn and Goldschmidt received ample warning that Paley Rothman intended to seek Rule 11 sanctions, and they had many opportunities to withdraw the allegations before summary judgment was granted. Paley Rothman gave the "safe harbor" warning on January 21, 1998, while Mr. Kahn was representing Fischer. Kahn did not withdraw until June 11, 1998. Mr. Goldschmidt was also given notice on January 21, although he did not formally represent Fischer at that time. On July 10, 1998, after Mr. Goldschmidt reentered his appearance, and with the Rule 11 motion still pending, Paley Rothman again requested that he dismiss the claims, making specific reference to Rule 11. Although the court denied the Rule 11 motion on July 24, 1998, the lawyers could not have been under any illusion that the court had rejected the request for sanctions as unfounded. Summary judgment was not entered until July 21, 1999. Each lawyer had many more than twenty-one days after notice was given in which he could have withdrawn the amended complaint. *See Holgate,* 425 F.3d at 677 ("The fact that Levinson was allowed to withdraw as coun-

sel ... does not protect him from sanctions based on a filing that he made before that withdrawal."); *id.* at 678 ("During the entire safe harbor period in 2002, Levinson was still acting as the Holgates' counsel and therefore had ample ability and opportunity to avoid Rule 11 sanctions by withdrawing or otherwise correcting the offending paper."). Both Mr. Goldschmidt and Mr. Kahn received the "safe harbor" protections of Rule 11(c)(1)(A).

### 2. Appellants Goldschmidt and Kahn Violated Rule 11

■ Following the Supreme Court's lead, we "apply an abuse-of-discretion standard in reviewing all aspects of [the trial] court's Rule 11 determination." *Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. 2447. Mr. Goldschmidt and Mr. Kahn devote most of their briefs to arguing that they had a legal and factual basis for suing Mark and Paley Rothman.[12] For example, Mr. Goldschmidt asserts that he "had a good faith factual basis for maintaining that Mark intentionally asserted a baseless claim on behalf of Flax in bad faith, in order to obtain compensation for Flax to which Flax had no cognizable legal entitlement." In stark contrast, when granting summary judgment to Paley Rothman on the tortious interference claim, Judge Graae concluded that "there is no doubt Mr. Mark had a lawyer's obligation to represent his client Flax on its compensation claim. Even though Flax was holding out for a larger fee than Fischer was prepared to pay, there is not a shred of evidence to support Fischer's claim that Paley Rothman was proceeding in bad

---

**12.** They also expend substantial effort trying to convince us that there was a factual basis for Fischer's claim that Howard Reissner was the first to contact Laidlaw about underwriting an initial public offering of Fischer Brew-

ing Company stock. *But see Fischer I,* 816 A.2d at 12–13. We reiterate that the Rule 11 sanctions were based upon the claims against Mr. Mark and Paley Rothman, not upon Benson Fischer's decision to sue Howard Flax.

faith." [13] Considering the same argument under Rule 11 standards, the trial court was struck by the fact that "the exhibits attached to [Fischer's] complaint ... establish the necessity for Mr. Mark's representation of Mr. Flax's interests." Both Mr. Goldschmidt and Mr. Kahn disagree with these and several other of Judge Graae's assessments of the evidence, but they have not demonstrated that those findings are clearly erroneous. *See Cooter & Gell*, 496 U.S. at 401, 110 S.Ct. 2447 ("A court of appeals would be justified in concluding that a [trial] court had abused its discretion in making a factual finding only if the finding were clearly erroneous."); *id.* at 400, 110 S.Ct. 2447 ("In practice, the 'clearly erroneous' standard requires the appellate court to uphold any district court determination that falls within a broad range of permissible conclusions.").

Only in rare circumstances will a party be justified in suing his opponent's lawyer. "An attorney 'who pursues in good faith his or her client's interests on a matter fairly debatable in the law' cannot be held liable to an opposing party." *Fischer I*, 816 A.2d at 6 (quoting *Strid v.*

*Converse*, 111 Wis.2d 418, 331 N.W.2d 350, 356 (1983)). Similarly, "there can be no conspiracy when an attorney acts within the scope of his employment ... [that is,] where an attorney's advice or advocacy is for the benefit of his client and not for the attorney's sole personal benefit." *Fraidin v. Weitzman*, 93 Md.App. 168, 611 A.2d 1046, 1079–80 (1992). On the other hand, an attorney may be liable if he "possess[es] a desire to harm which is independent of the desire to protect his client. This would constitute actual malice and therefore substantiate a tortious interference with contract claim." *Id.* at 1080. *Fraidin* recognizes that an attorney sometimes may be liable to the opposing party, but there was no factual basis for concluding that this was one of those rare instances.[14]

Mr. Fischer speculated that Mr. Mark was motivated by malice because of his friendship with Flax, but we have rejected a similar inference on comparable facts. In *Ammerman v. Newman*, 384 A.2d 637 (D.C.1978), the trial court had granted summary judgment for the defendants in a suit claiming that Mrs. Newman and her

13. As we previously have observed, "Fischer's claims of conspiracy and aiding and abetting are entirely derivative of his claim of tortious interference by Flax." *Fischer I*, 816 A.2d at 5. We found no law "recognizing a civil cause of action for extortion in this jurisdiction...." *Id.*

14. Mr. Goldschmidt cites other cases discussing an attorney's liability to an opposing party, but those decisions do not support his cause. *See Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1080 (2d Cir.1977) ("[A]dmission to the bar does not create a license to act maliciously, fraudulently, or knowingly to tread upon the legal rights of others."); *McElhanon v. Hing*, 151 Ariz. 386, 728 P.2d 256, 264 (Ct.App.1985) ("The privilege an attorney has for his actions in representing a client is a qualified one that does not extend to the intentional torts of malicious prosecution and abuse of process. Nor should the

privilege apply to the intentional acts of furthering and participating in a fraudulent conveyance."); *Miller v. Ortman*, 235 Ind. 641, 136 N.E.2d 17, 41 (1956) ("It was the nature of his acts and not his capacity [acting as an attorney] which determines the liability for his conduct."); *Strid v. Converse*, 111 Wis.2d 418, 331 N.W.2d 350, 356 (1983) ("The immunity from liability to third parties extends to an attorney who pursues in good faith his or her client's interests on a matter fairly debatable in the law. However, the immunity does not apply when the attorney acts in a malicious, fraudulent or tortious manner which frustrates the administration of justice or to obtain something for the client to which the client is not justly entitled."). The problem for Mr. Goldschmidt and Mr. Kahn is that they *did not have a factual basis* for alleging that Mark and Paley Rothman were liable under the principles discussed in these cases.

attorneys were guilty of malicious prosecution. One of the attorneys was Mrs. Newman's son-in-law, and the plaintiffs argued that his "uncharacteristically close ties to the family's decision-making process [raised] a basic question of material fact regarding [his] degree of involvement in permitting an unwarranted suit to run its full course." We concluded that "[s]uch an unsupported allegation is clearly insufficient." *Id.* at 641. The attorney's decision "to associate himself with a suit involving a close member of his family," while perhaps unwise, "in no way establishes malice on his part...." *Id.* There was even less reason in this case to believe that Mr. Mark was acting out of malice. Mr. Goldschmidt and Mr. Kahn failed to recognize the difference between mere speculation and a legitimate inference. *See Majeska v. District of Columbia,* 812 A.2d 948, 950 (D.C. 2002) ("[T]he courts of this jurisdiction have emphasized the distinction between the logical deduction and mere conjecture." (internal quotation marks and citation omitted)). The trial court did not abuse its discretion by imposing Rule 11 sanctions.

### 3. The Amount of Sanctions

Rule 11 specifies that "[a] sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Super. Ct. Civ. R. 11(c)(2) (1995 Supp.). If the sanction is "imposed on motion and warranted for effective deterrence," the court may direct "payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." *Id.*

 Being thoroughly familiar with the record, the trial court recognized "that the claims made against Paley Rothman infected the entire litigation ... [and] had a

huge impact ... in terms of time and expense...." "Mr. Mark and Paley Rothman, although thoroughly vindicated on the merits, were badly hurt by this litigation ... a case they should never have had to defend." Nevertheless, the court did not attempt to make them whole. Instead, it focused on the deterrent purpose of Rule 11 and the resources of Kahn and Goldschmidt. The court noted that the total sanction it imposed was "less than 14% of Paley Rothman's bill...." Mr. Goldschmidt had initiated the litigation, but "[g]iven the history of the case—including Mr. Kahn's filing of a new Count IV and his failure to take advantage of the 21–day 'safe harbor' in Rule 11—the court [saw] no basis for finding either lawyer more or less culpable than the other."

This record reflects a careful exercise of the trial court's discretion. Although Messrs. ˙ Kahn and Goldschmidt view the evidence differently, they have not demonstrated that the trial court based its decision on "a clearly erroneous evaluation of the evidence...." *Kleiman,* 633 A.2d at 1383. Nor did the court abuse its discretion in setting the amount of the sanctions. *See Cunningham,* 719 A.2d at 502. Accordingly, we affirm the judgments imposing sanctions.

### V. Conclusion

For the reasons stated, we affirm the judgment denying Mr. Fischer's motion to vacate and the judgments imposing sanctions on Mr. Goldschmidt and Mr. Kahn. We vacate the decision denying enforcement of the writ of attachment and remand for further proceedings consistent with this opinion.

*So ordered.*